R. Alexander Pilmer (CA 166196)
**KIRKLAND & ELLIS LLP**
333 South Hope Street
Los Angeles, California 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Meredith L. Shafe (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Attorneys for the Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Chapter 11 |
| SOUTH BAY EXPRESSWAY, L.P. and CALIFORNIA TRANSPORTATION VENTURES, INC.,[1] | Case No. 10-04516-LA11 |
| | (Jointly Administered with Case No. 10-04518) |
| Debtors. | **MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING THE IMPLEMENTATION OF A KEY EMPLOYEE INCENTIVE PROGRAM** |
| | Date: September 23, 2010 Time: 2:30 p.m. (prevailing Pacific Time) Place: The Jacob Weinberger U.S. Courthouse Courtroom 118, 325 West F Street San Diego, California 92101 |

---

[1] Pursuant to section 342(c)(1) of title 11 of the United States Code, the last four digits of each debtor's federal tax identification number are: South Bay Expressway, L.P. (9083) and California Transportation Ventures, Inc. (5119). The location of the debtors' corporate headquarters and the debtors' service address is: 1129 La Media Road, San Diego, California 91914.

TO THE HONORABLE JUDGE LOUISE D. ADLER, UNITED STATES BANKRUPTCY JUDGE, SECURED CREDITORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE SOUTHERN DISTRICT OF CALIFORNIA:

South Bay Expressway, L.P. ("SBX") and California Transportation Ventures, Inc. ("CTV"), as debtors and debtors in possession (collectively, the "Debtors"), file this motion (together with the accompanying Memorandum of Points and Authorities, the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, authorizing, but not directing, the Debtors to implement the Debtors' proposed key employee incentive program (the "Incentive Program"), a summary of which is attached hereto, along with the Budget and Project Completion Budget (both as defined herein) approved by the Debtors' board of directors and prepetition secured lenders, as **Exhibits 1, 1(a), and 1(b)** to **Exhibit A**.

## JURISDICTION

The United States Bankruptcy Court for the Southern District of California (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the relief requested herein are sections 105, 363(b), and 503(c) of title 11 of the United States Code (the "Bankruptcy Code").

## RELIEF REQUESTED

By this Motion, the Debtors move the Court for entry of an order, substantially in the form attached hereto as **Exhibit A**, authorizing, but not directing, the Debtors to implement the Incentive Program for four members of the Debtors' senior management, two of whom are "insiders" as

2

defined under section 101(31) of the Bankruptcy Code and two of whom the Debtors believe are not insiders as defined under section 101(31) of the Bankruptcy Code.[2]

## BASIS FOR RELIEF

The bases for the relief requested in this Motion are set forth in the following Memorandum of Points and Authorities, the *Declaration of Anthony G. Evans, Chief Financial Officer of South Bay Expressway, L.P., in Support of the Motion of the Debtors for Entry of an Order Authorizing the Implementation of a Key Employee Incentive Program* (the "Evans Declaration"), attached hereto as **Exhibit B**, and the *Declaration of Robert Warshauer, Managing Director of Imperial Capital, LLC, in Support of the Motion of the Debtors for Entry of an Order Authorizing the Implementation of a Key Employee Incentive Program* (the "Warshauer Declaration"), attached hereto as **Exhibit C**.

## NOTICE

In accordance with Rules 2002-1, 2002-4, and 9014-3 of the Local Rules of the United States Bankruptcy Court for the Southern District of California (the "Local Bankruptcy Rules") and the *Amended Order on First Day Motion of the Debtors for Order Limiting Scope of Notice* [Docket No. 53], the Debtors have provided a copy of this Motion and a Notice of Motion to: (a) the Office of the United States Trustee for the Southern District of California (the "U.S. Trustee"); (b) counsel to the official committee of unsecured creditors; (c) counsel to the agent for the Debtors' prepetition senior loan agreement; (d) counsel to the lender under the Debtors' prepetition TIFIA

---

[2]    As noted in the *First Day Motion and First Day Motion of the Debtors for Entry of an Order Authorizing, but not Directing, the Debtors to Pay Interim Compensation to Insiders; Declarations in Support Thereof* [Docket No. 12], the *Motion of the Debtors for Entry of an Order (A) Authorizing Compensation of Insiders on a Final Basis Nunc Pro Tunc to March 22, 2010 and (B) Waiving the Requirements of Local Bankruptcy Rule 4002-2(b)(2)* [Docket No. 231], and the *Ex Parte Motion of the Debtors for Entry of an Order (A) Extending Authority to Compensate Insiders on an Interim Basis and (B) Waiving Requirements of Local Bankruptcy Rule 4002-2(b)(2)* [Docket No. 255], the Debtors believe that only Greg Hulsizer, the Debtors' Chief Executive Officer, and Anthony Evans, the Debtors' Chief Financial Officer, are "insiders" under section 101(31) of the Bankruptcy Code by virtue of their positions as a "persons in control of" the Debtors. The Debtors believe that Theresa Weekes, the Debtors' Chief Accounting Officer, and Shane Savgur, the Debtors' Chief Technology Officer, are not insiders.

3

loan agreement; (e) the United States Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the United States Attorney for the Southern District of California; (h) the United States Department of Transportation; (i) the California Department of Transportation ("Caltrans") and counsel to Caltrans; and (j) any party that has requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.  The Debtors respectfully submit that no further notice of this Motion or the relief requested herein is required.

*[Remainder of Page Intentionally Left Blank]*

K&E 17130321

PLEASE NOTE THAT PURSUANT TO LOCAL BANKRUPTCY RULE 9013-4, EACH PARTY OPPOSING A MOTION SHALL SERVE THAT OPPOSITION AND LOCAL FORM CSD 1184 NO LATER THAN 14 DAYS AFTER SERVICE OF THE NOTICE OF INTENDED ACTION, IF PERSONALLY SERVED.  IF SERVED BY MAIL, THE PARTY OPPOSING SHALL HAVE 17 DAYS TO SERVE SUCH OPPOSITION AS PROVIDED BY BANKRUPTCY RULE 9006.  PLEASE NOTE THAT THE FAILURE TO TIMELY FILE OPPOSITION TO THIS MOTION MAY BE DEEMED TO BE CONSENT TO THE RELIEF REQUESTED HEREIN, AND THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE OR A HEARING.

Dated: August 23, 2010
San Diego, California

/s/ R. Alexander Pilmer

R. Alexander Pilmer (CA 166196)
**KIRKLAND & ELLIS LLP**
333 South Hope Street
Los Angeles, California  90071
Telephone:     (213) 680-8400
Facsimile:     (213) 680-8500

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Meredith L. Shafe (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
300 North LaSalle Street
Chicago, Illinois  60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

Attorneys for the Debtors
and Debtors in Possession

K&E 17130321

# TABLE OF CONTENTS

**Page**

I.  Preliminary Statement................................................................................................1

II.  Background..............................................................................................................3

    A.  Compensation of the Key Employees...................................................................4

        1.  CEO and CFO.............................................................................................4

        2.  CAO and CTO. ..........................................................................................5

    B.  Need for and Development of the Incentive Program. ...........................................7

    C.  Summary of the Incentive Program. .....................................................................8

        1.  Metric #1:  Financial Performance (All Key Employees) ..........................9

        2.  Metric #2:  Project Completion (CEO and CFO). ...................................11

        3.  Metric #3:  Emergence from Chapter 11 Protection (CEO and CFO).......13

III.  Basis for Relief. .....................................................................................................14

    A.  The Incentive Program is Not A Retention Plan Under Section 503(c)(1). ..........16

    B.  The Incentive Program Is Not A Severance Plan Under Section 503(c)(2). .........19

    C.  The Incentive Program Is An Exercise of the Debtors Reasonable Business Judgment Under Section 503(c)(3). .......................................................................20

vi

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Am. W. Airlines, Inc.*,
 171 B.R. 674 (Bankr. D. Ariz. 1994) ................................................................. 22

*In re Bordier's Nursery, Inc.*,
 No. 08-18501 (Bankr. C.D. Cal. May 13, 2009) ................................................. 22

*In re CEP Holdings, LLC*,
 2006 WL 3422665 (Bankr. N.D. Ohio 2006) ..................................................... 15

*In re Dana Corp.*,
 358 B.R. 567 (Bankr. S.D.N.Y. 2006) ......................................................... passim

*In re DURA Automotive Systems, Inc.*,
 No. 06-11202 (KJC) (Bankr. D. Del. 2007) ....................................................... 17

*In re Foothills Texas, Inc.*,
 408 B.R. 573 (Bankr. D. Del. 2009) ................................................................... 15

*In re Global Homes Prods., LLC*,
 369 B.R. 778 (Bankr. D. Del. 2007) ............................................................. passim

*In re Journal Register Co.*,
 407 B.R. 520 (Bankr. S.D.N.Y. 2009) ................................................................ 19

*In re Nellson Nutraceutical, Inc.*,
 369 B.R. 787 (Bankr. D. Del. 2007) ................................................................... 16

*In re Nellson Nutraceutical, Inc.*,
 Case No. 06-10072 (CSS) Bankr. D. Del. July 18, 2006) ................................... 13

*In re Nobex Corp.*,
 2006 WL 4063024 (Bankr. D. Del. Jan. 19, 2006) ....................................... 14, 20

*In re Pilgrim's Pride Corp.*,
 401 B.R. 229 (Bankr. N.D. Tex. 2009) ............................................................... 20

*In re Public Access Technology*,
 307 B.R. 500 (E.D. Va. 2004) ............................................................................ 15

*In re Werner Holding Co., Inc.*,
 Case No. 06-10578 (Bankr. D. Del. 2006) .......................................................... 14

**Statutes**

11 U.S.C. § 101(31)(B) .............................................................................................. 16

11 U.S.C. § 101(31)(C)(i) .......................................................................................... 15

11 U.S.C. § 101(31)(C)(ii) ............................................................................................. 15

11 U.S.C. § 101(31)(C)(iii) ............................................................................................ 15

11 U.S.C. § 101(31)(C)(iv) ............................................................................................ 15

11 U.S.C. § 101(31)(C)(v) ............................................................................................. 15

11 U.S.C. § 1107(a) ......................................................................................................... 3

11 U.S.C. § 1108 .............................................................................................................. 3

11 U.S.C. § 503(c)(1) ............................................................................................... 16, 17

11 U.S.C. § 503(c)(2) ..................................................................................................... 20

11 U.S.C. § 503(c)(3) ..................................................................................................... 21

**Rules**

Bankruptcy Rule 1015(b) .................................................................................................. 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

K&E 17130321

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    Preliminary Statement.

The Debtors seek approval to implement the Incentive Program for the four employees who have the greatest impact on the Debtors' ongoing business and restructuring efforts:  (a) Greg Hulsizer, the Debtors' Chief Executive Officer (the "CEO"); (b) Anthony Evans, the Debtors' Chief Financial Officer (the "CFO"); (c) Theresa Weekes, the Debtors' Chief Accounting Officer ("CAO"); (d) Shane Savgur, the Debtors' Chief Technology Officer ("CTO") (collectively, the "Key Employees").  The Incentive Program—which will cost the Debtors' estates a maximum of $681,800—provides for the payment of performance-based cash bonuses that are commensurate with market practice, is cost-effective, and has been carefully tailored to ensure that the Key Employees remain focused on financial, operational, and restructuring goals that will directly benefit the Debtors' estates and their creditors.  Beginning well before the Petition Date (as defined herein), the Debtors have relied and continue to rely on the Key Employees to discharge significant responsibilities related to these chapter 11 cases in addition to their regular duties.  At the same time, the Key Employees have seen their compensation suffer as a result of these chapter 11 cases and face uncertainty regarding employment upon the Debtors' emergence from chapter 11.  In the past and immediately prior to the Petition Date, the Debtors provided the Key Employees with opportunities to earn cash bonuses upon achieving budgeted financial goals, which have motivated the Key Employees to perform at a superlative level and increase the value of the Debtors' business.  Under these circumstances, the Debtors have determined that implementing the Incentive Program is in the best interests of their estates and all parties in interest.

The Incentive Program aligns the interests of the Key Employees with the interests of the Debtors and the Debtors' stakeholders by rewarding the Key Employees' accomplishment of financial and bankruptcy-related milestones that directly increase the value of the Debtors' estates.

1

Specifically, the Incentive Program provides for cash bonuses based upon achievement of three metrics: (1) the Debtors' financial performance compared to the Debtors' 2010 operating budget (the "Budget") approved by the Debtors' board of directors (the "Board") and the Debtors' senior secured lenders (the "Secured Financing Parties"); (2) timing and costs of the completion of works outstanding under the Franchise Agreement and budgeted capital improvements, as compared to the project completion budget approved by the Board and the Secured Financing Parties in December 2009 ("Project Completion Budget");[1] and (3) the timing of the Debtors' emergence from bankruptcy protection.

The Key Employees have been aware of the Budget and the targets thereunder since the Budget was approved by the Board in January 2010, and have been motivated by the Debtors' prior practice of providing performance-based cash bonuses to meet and exceed those targets. Further, the Key Employees have been aware of and motivated by the Board's consideration and development of the Incentive Program. As a result of the Key Employee's diligent efforts (undertaken with knowledge of the Incentive Program's proposed parameters), the Incentive Program is guaranteed to pay for itself. Specifically, within weeks prior to the filing of this Motion, the Debtors successfully settled appeals (the "Appeals") of the San Diego County Assessor's assessments of an alleged possessory interest for the Debtors' possession and use of land and improvements pursuant to a lease entered into by the Debtors and Caltrans (the "Property"). As a result of a negotiated settlement of the Appeals (the "Tax Settlement"), which this Court approved on August 14, 2010,[2] and the Assessment Appeals Boards approved on or about August 17, 2010, the Debtors were able to

---

[1] The Project Completion Budget was approved by the Board and agreed upon by the Debtors and the Secured Financing Parties as part of that certain Standstill Agreement, dated as of December 15, 2009.

[2] *Order on Motion of the Debtors for Entry of an Order Approving and Authorizing a Settlement Agreement Between the Debtors and the San Diego County Assessor* [Docket No. 416].

2

achieve savings of <u>at least</u> of $8.6 million in taxes on the Property, and ensure a tax refund of <u>at least</u> $5.1 million—one of the largest property tax refunds ever obtained in San Diego County—while preserving the Debtors' ability to further pursue the Appeals, which could result in total tax savings of approximately $17.4 million and a total refund of approximately $13.9 million. The property tax savings and refund achieved through the Tax Settlement surpassed the projected effect of a settlement of the Appeals provided in the Budget by a minimum of approximately $4.8 million. This outcome for the Debtors' estates and stakeholders would not have been possible without the dedication and diligent efforts of the Key Employees during these chapter 11 cases. The Incentive Program provides financial incentives to further motivate the Key Employees to increase the value of the Debtors' estates.

## II.    Background.

On the March 22, 2010 (the "<u>Petition Date</u>"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On March 24, 2010, the Court ordered joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). On June 29, 2010, the U.S. Trustee appointed an official committee of unsecured creditors.

The Debtors developed and operate a four-lane, nine-mile express toll road in Southern California commonly referred to as the South Bay Expressway or State Road 125 (the "<u>Expressway</u>"). The Expressway extends from Spring Valley to Otay Mesa and provides fast and convenient access to and from Mexico and communities across San Diego County, relieves traffic congestion, and reduces travel time for commuters in the South Bay and Otay Mesa regions. Since opening on November 19, 2007, the Expressway has carried over 21 million vehicle trips with traffic

3

on weekdays averaging over 25,000 vehicle trips  and weekend traffic averaging over 16,000 vehicle trips.

The Debtors' corporate headquarters are located in San Diego, California, where they employ 53 people.  For the fiscal year ending June 30, 2009, the Debtors had total revenues of approximately $21 million and adjusted EBITDA of approximately $3 million.  As of the Petition Date, the Debtors had approximately $640 million in book value of total assets and approximately $570 million in book value of total liabilities.

**A.      Compensation of the Key Employees.**

Historically and immediately prior to the Petition Date, the Debtors have provided the Key Employees with opportunities for cash bonuses, which are summarized generally below.

**1.      CEO and CFO.**

Historically, the Debtors provided their CEO and CFO the opportunity to earn cash bonuses on account of project milestones and continued employment with the Debtors.  The CEO and CFO were hired in large part to oversee the Debtors' construction of the Expressway and, as such, bonuses were initially structured around construction completion milestones to incentivize those Key Employees toward an expeditious opening of the Expressway.  Evans Declaration at ¶ 8.  For the CEO, individual cash awards ranged from $75,000 for construction milestones to $250,000 for the opening of the Expressway, with annual bonuses thereafter in the amount of 30% of annual base salary.  Evans Declaration at ¶ 8.  For the CFO, individual cash awards ranged from in 25% of annual base salary for financing and construction milestones to 100% of annual base salary for the opening of the Expressway.  Evans Declaration at ¶ 8.

Immediately prior to the Petition Date, the CEO and CFO were compensated pursuant to their respective employment agreement with the Debtors, which were approved by the Debtors' board of directors (the "Board") and the Debtors' prepetition secured lenders (the "Secured

4

Financing Parties").  Evans Declaration ¶ 9; Greg Hulsizer Employment Agreement and Anthony Evans Employment Agreement, attached hereto as **Exhibit D** and **Exhibit E**, respectively, and incorporated herein by reference.  For the year 2010, annual compensation for the CEO and CFO was structured such that each individual would receive his total annual compensation in the form of (a) a base salary, paid monthly; (b) semi-annual retention bonus payments, payable on June 30, 2010 and December 31, 2010, that together amounted to 100% of respective base salary; and (c) performance-based bonuses in an aggregate amount 50% of respective annual salary, payable quarterly upon achievement of Budgeted EBITDA and certain completion and operational metrics. Evans Declaration at ¶ 9.  Accordingly, immediately prior to the Petition Date, the CEO and CFO each stood to earn annual cash bonus payments of up to 150% of his respective annual base salary. Evans Declaration at ¶ 9.  On account of the Debtors' chapter 11 filing, the Debtors have not paid any cash bonus payments to the CEO and CFO during the postpetition period.  Evans Declaration at ¶ 9.  Indeed, the retention bonus structure contemplated by the CEO's and CFO's employment agreements does not comport with section 503(c)(1) of the Bankruptcy Code.

### 2.    CAO and CTO.

Historically, the Debtors provided the CAO and CTO with opportunities for cash bonuses, though on a more limited basis than the CEO and CFO.  This difference reflects the broader control and authority of the CEO and CFO as compared to the CAO and CTO, who are each subject to the supervision and authority of the CEO and CFO.  Evans Declaration at ¶ 10.  With respect to the CTO, Mr. Savgur was initially hired as Systems Manager during the construction of the Expressway. As such, he was initially eligible for a cash bonus of $20,000 for opening of the Expressway.  Evans Declaration at ¶ 10.  In addition, Mr. Savgur was eligible for an annual cash bonus of up to 15% of annual base salary.  Evans Declaration at ¶ 10.  With respect to the CAO, Ms. Weekes was initially hired as the Debtors' Controller after the opening of the Expressway.  Evans Declaration at ¶ 10.

5

She was initially eligible for an annual cash bonus of up to 20% of annual base salary. Both Ms. Weekes and Mr. Savgur were given their current job titles in August 2009. Evans Declaration at ¶ 10.

Immediately prior to the Petition Date, for the year 2010, the CAO and CTO were compensated pursuant to their respective employment contracts with the Debtors, which were approved by the Board and the Secured Financing Parties. Evans Declaration at ¶ 11; *see* Theresa Weekes Employment Agreement and Shane Savgur Employment Agreement, attached hereto as **Exhibit F** and **Exhibit G**, respectively, and incorporated herein by reference. Annual compensation for the CAO and CTO was structured as: (a) an annual base salary; (b) an annual discretionary performance-based bonus of up to 20% of annual base salary, payable in December 2010; and (c) retention bonuses of up to 60% of annual base salary, payable on December 31, 2012, or upon termination without good cause or in the event of a change in control of the Debtors. Evans Declaration at ¶ 11. The CAO's and CTO's respective employment agreements also provided for severance benefits in the amount of six months (*i.e.*, 50%) of annual base salary. The Debtors have not paid any cash bonus payments to the CAO and CTO during the postpetition period. Evans Declaration at ¶ 11.

On March 24, 2010, the Court entered the *Amended Order on First Day Motion of the Debtors for Entry of Order Authorizing, But Not Directing, the Debtors to Pay Interim Compensation to Insiders* [Docket No. 29]. On June 2, 2010, the Court entered the *Ex Parte Order on Ex Parte Motion of the Debtors for Entry of an Order (A) Extending Authority to Compensate Insiders on an Interim Basis and (B) Waiving Requirements of Local Bankruptcy Rule 4002-2(b)(2)* [Docket No. 282]. On June 22, 2010, the Court entered the *Order on Motion of the Debtors for Entry of an Order (A) Authorizing Compensation of Insiders on a Final Basis Nunc Pro Tunc to*

*March 22, 2010 and (B) Waiving the Requirements of Local Bankruptcy Rule 4002-2(b)(2)* [Docket No. 354].

Pursuant to the above-referenced orders, the Debtors have compensated the Key Employees in the ordinary course of business in accordance with the Key Employee's respective prepetition employment agreements to the extent of the Key Employee's annual base compensation. During the postpetition period, the Debtors have not paid any incentive or retention bonuses due under those employment agreements. Evans Declaration at ¶¶ 9, 11.

**B.      Need for and Development of the Incentive Program.**

The demands placed upon the Key Employees have never been greater. As a result of cost-cutting initiatives in the two years prior to the Petition Date, the Debtors' organization structure is quite lean, with little to no middle management. As a result, the Debtors rely heavily on the Key Employees' knowledge, experience, and dedication. Evans Declaration at ¶ 13.

In addition to responsibility for the day-to-day management of the Debtors' business, the Key Employees have shouldered significant responsibilities stemming from the preparation and administration of the Debtors' chapter 11 cases and from litigation of the adversary proceedings and will continue to shoulder much responsibility for the duration of these chapter 11 cases. Evans Declaration at ¶ 14. At the same time, the Key Employees have received no assurances regarding post-emergence compensation or employment. Evans Declaration at ¶ 18.

With these considerations in mind, the Board directed the Debtors' financial advisor, Imperial Capital, LLC ("Imperial Capital"), to work with the Board, the Debtors, and the Debtors' restructuring counsel to assess the current compensation of the Key Employees. Evans Declaration at ¶ 19. Imperial Capital conducted a comprehensive analysis of the Debtors' postpetition compensation practices and needs, including benchmarking against the compensation and incentive programs provided by comparable employers and similarly-sized chapter 11 debtors. *See* Warshauer

7

Declaration at ¶¶ 15-19.  After substantial additional review, analysis, and discussion, and after taking into consideration alternative designs and the likely concerns of the Debtors' constituencies, the disinterested members of the Board, Mark Wong, Peter Trent, and Christopher Leslie, found implementation of the proposed Incentive Program to be necessary and appropriate to compensate the Key Employees adequately for the discharge of very significant restructuring responsibilities they have assumed in addition to their day-to-day duties and to incentivize the Key Employees to continue devoting their energy, knowledge, expertise, and creativity to the Debtors' efforts to operate their business effectively and conclude these chapter 11 cases as expeditiously as possible.[3] Evans Declaration at ¶ 20.

Upon obtaining Board approval of the Incentive Program, the Debtors and the Debtors' advisors also consulted the Secured Financing Parties and the Secured Financing Parties' advisors as to the terms of the Incentive Program.  As a result, the Secured Financing Parties have consented to implementation of the Incentive Program.  Evans Declaration at ¶ 22.

C.    **Summary of the Incentive Program.**

The Incentive Program provides all of the Key Employees the opportunity to earn cash bonuses equal to between 40% and 100% of annual base salary based on the Debtors' financial performance and provides the CEO and CFO with additional opportunities to earn cash bonuses equal to between 10% and 100% of annual base salary based on efficient project completion and expeditious emergence from chapter 11.  Specifically, the Incentive Program is comprised of three separate metrics:

- **Metric #1 (all Key Employees):**  the Debtors' actual 2010 EBITDA compared to the Debtors' EBITDA targets in the Budget;

- **Metric #2 (CEO and CFO):**  actual 2010 project completion timing and costs

---

[3]    Mr. Hulsizer did not participate in the Board's vote to approve the Incentive Program.  Evans Declaration at ¶ 20.

8

compared to the Project Completion Budget; and

- **Metric #3 (CEO and CFO):** the timing of the Debtors' emergence from bankruptcy protection.

*See* **Exhibit 1** to **Exhibit A**; Warshauer Declaration at ¶ 9.

For each of these metrics, if the Debtors' performance with respect to the individual metric does not meet certain minimum thresholds, no Key Employee will receive a cash bonus in respect of that metric. At the same time, regardless of how well the Debtors perform on each of these metrics, total cash awards to any Key Employee, across all metrics of the Incentive Program, are capped at 100% of base salary, resulting in an aggregate cap of $681,800. Warshauer Declaration at ¶ 11.

### 1.    Metric #1:  Financial Performance (All Key Employees)

The first metric of the Incentive Program provides opportunities for cash awards to each of the Key Employees based upon a comparison of the Debtors' earnings ("Actual EBITDA") and the budgeted EBITDA shown in the Budget ("Budgeted EBITDA").[4] If Actual EBITDA and Budgeted EBITDA are the same, each Key Employee will receive a cash award at the "target" rate, calculated as a percentage of annual base salary as follows:

| Key Employee | Target Bonus as % of Base Salary | Target Bonus as Cash Amount |
|---|---|---|
| Greg Hulsizer | 50% | $137,500 |
| Anthony Evans | 50% | $120,000 |
| Theresa Weekes | 40% | $55,600 |
| Shane Savgur | 40% | $55,600 |
| **Target Bonus Pool:** | | **$368,700** |

If Actual EBITDA for the 2010 calendar year exceeds Budgeted EBITDA, the target bonus pool will be increased by an amount equaling 15% of the incremental EBITDA (the "Bonus Pool Increase"), and each Key Employee will receive a cash award that (a) equals the target bonus

---

[4]  Actual EBITDA includes any tax refunds and excludes Incentive Program bonuses, project completion costs, and restructuring costs, including professional fees. In the event that emergence from chapter 11 occurs before a year-end, the Key Employees will be eligible to earn cash bonuses under this metric on a prorated basis. For 2011, target bonuses and Budgeted EBITDA will correspond to the budget approved by the Board for 2011.

9

amount plus the percentage of the Bonus Pool Increase proportionate to base salary and (b) is no more than 150% of the target bonus amount.[5]  Accordingly, the cash awards that the Key Employees may earn on the basis of the first metric will not exceed the amounts set forth below:

| Key Employee | Maximum Cash Award |
|---|---|
| Greg Hulsizer | $206,250 |
| Anthony Evans | $180,000 |
| Theresa Weekes | $83,400 |
| Shane Savgur | $83,400 |
| Total: | $553,050 |

If Actual EBITDA is between 90% and 100% of Budgeted EBITDA, the target bonus pool will be reduced by 30% of the difference, and each Key Employee will receive a cash award equaling the target amount less the percentage of the difference proportionate to base salary.  If Actual EBITDA is less than 90% of Budgeted EBITDA, Key Employees will not receive cash awards on the basis of this metric.

As approved by the Board and the Secured Financing Parties, the Budgeted EBITDA established rigorous targets, which the Key Employees have worked and continue to work diligently to achieve.  Evans Declaration at ¶ 24.  Specifically, the Budget provided for a 5.1% increase in tolling revenues, from $22.6 million actually achieved in 2009 to $23.7 million in revenues for the year ended December 31, 2010.  In addition, the Budget provided for an 8.5% increase in revenues after operating costs,[6] from $12.5 million actually achieved in 2009 to $13.6 million for 2010.  Evans Declaration at ¶ 25.  These targets represent challenging goals for the Key Employees to achieve, particularly in light of the prevailing economic condition of the areas surrounding the Expressway.  Evans Declaration at ¶ 25.  These revenue targets contemplate significant efforts by

---

[5]  Allocations of the bonus pool amount are as follows:  (a) Greg Hulsizer—34.7%; (b) Anthony Evans—30.3%; (c) Theresa Weeks—17.5%; and (d) Shane Savgur—17.5%.

[6]  This figure excludes bonuses paid in 2009 and bonuses budgeted for 2010, as well as property taxes paid in 2009 and property taxes projected in 2010.

10

the Key Employees, including, but not limited to, working and coordinating with specialty consultants and original equipment vendors, to assess, repair, replace, and improve toll collection systems to meet contractual tolling requirements.  Evans Declaration at ¶ 25.

The Budgeted EBITDA also contemplates achievement of a reduction in property tax liability and a property tax refund on account of the Appeals in the amount of $273,000.  Evans Declaration at ¶ 26.  Obtaining a reduction of the Debtors' historical property taxes required extensive efforts by the Key Employees to produce necessary documentation to and negotiate with the San Diego County Assessor.  Evans Declaration at ¶ 26.  Through the Tax Settlement, the Debtors obtained not only a reduction of property tax liability in excess of $8.3 million, but also one of the largest tax refunds ever obtained in San Diego County, increasing the value of the Debtors' estates by a minimum of approximately $5.1 million in cash—an achievement of 1700% of the target property tax refund approved by the Board and the Secured Financing Parties.  Evans Declaration at ¶ 26.

The cash value of the Tax Settlement is included in the calculation of Actual EBITDA.  As a result, the Key Employees will achieve the maximum cash awards under Metric #1.  Evans Declaration at ¶ 27.

### 2.    Metric #2:  Project Completion (CEO and CFO).

The second metric of the Incentive Program also provides for annual cash awards to the Debtors' CEO and CFO if outstanding capital expenditures and completion obligations under the Project Completion Budget are completed in a timely and cost-effective manner—*i.e.*, below budgeted cost.  The pool for cash awards under this metric will equal 15% of the net cost savings ("Cost Savings").  The Cost Savings will be the cumulative net total of the permanent cost savings and permanent cost increases calculated by looking at the work completed on each individual project (line item on the Project Completion Budget) (the "Projects").  Expenditures deferred beyond 2010

11

will not constitute permanent savings and will not be included in the bonus calculation.  The Cost Savings will be determined by the Board, subject to concurrence by the Secured Financing Parties' technical advisor, which shall not be unreasonably withheld or delayed.  The CEO and CFO will each receive 50% of the pool.  If project completion costs exceed the Project Completion Budget, neither the CEO nor the CFO will receive a cash award on the basis of this metric.

For those Projects which are required under the Development Franchise Agreement to be completed prior to December 31, 2010, in order for the cost savings to be included in the Cost Savings calculation they must be completed by December 31, 2010.  However, permanent cost increases on these projects will be netted against cost savings.  To the extent the Board determines that an individual project has been delayed by either Caltrans or the Secured Financing Parties and will not be completed by December 31, 2010 through no fault of the CEO and CFO, permanent savings on this project will remain eligible for inclusion in the Cost Savings calculation.  Cost-savings achieved under this metric will not affect calculation of Actual EBITDA and, as such, will not result in a "double-dip" with respect to cash awards under the first metric.  To the extent prepetition costs incurred under the Project Completion Budget were not paid and have become unsecured claims, the Cost Savings calculation will exclude any implied savings as a result of the bankruptcy filing.

The Projects include Projects required by the Franchise Agreement and Projects designed to improve tolling and/or reduce operating costs.[7]  In developing the Incentive Program, Imperial Capital reviewed the Debtors' historical project completion schedules and analyzed closely the Projects included in the Budget.  Warshauer Declaration at ¶ 11.

---

[7]    An example of such Projects include improvement of tolling equipment responsible for identifying customers' license plates and recording traffic flow, which will increase tolling efficiency and, in turn, the Debtors' toll revenues.

K&E 17130321

Currently, the Debtors are largely on schedule to complete those Projects required to be completed by December 31, 2010, but to achieve Cost Savings and stay on schedule with respect to the Projects, will require active management of contractor, insurer, and vendor relationships, and diligent attention to expenditures, including minimizing change orders and developing more efficient means of achieving Project objectives.  Evans Declaration at ¶ 28.  As such, Imperial Capital has carefully tailored this metric to challenge the CEO and CFO.

**3.      Metric #3:  Emergence from Chapter 11 Protection (CEO and CFO).**

Finally, the third metric of the Incentive Plan provides that the Debtors' CEO and CFO will be eligible for cash awards based upon how quickly the Debtors emerge from chapter 11 protection after the entry of an order by the Court determining the lien priority between the Secured Financing Parties and the mechanics lien claimants.  Cash awards will be calculated as a percentage of base salary, as follows:

| Emergence after Resolution of Priority Dispute | Cash Award as % of Base Salary |
|---|---|
| Within 90 days | 50% |
| Within 135 days | 25% |
| Within 180 days | 10% |
| **Maximum Total Awards:** | **$257,500** |

The CEO and CFO will receive cash bonuses under the third metric only if the Debtors are able to formulate a plan of reorganization, solicit votes sufficient for confirmation, and substantially consummate the plan within six months of the Court entering an order determining the lien priority dispute.  As such, the third metric is not merely a reward for continued employment with the Debtors through emergence from chapter 11.  *See*, *e.g.*, *In re Nellson Nutraceutical, Inc.*, Case No. 06-10072 (CSS) Bankr. D. Del. July 18, 2006)    (finding that management incentive payments that vested if the plan of reorganization was confirmed/effective before a certain date was not governed by section 503(c)(1) of the Bankruptcy Code).

13

K&E 17130321

If the Debtors do not emerge from chapter 11 protection within that timeframe, neither the CEO nor the CFO will receive any cash award on the basis of this metric. Accordingly, the third metric is designed to incentivize the CEO and CFO to expeditiously emerge from chapter 11, rather than merely reward retention through the Debtors' exit from bankruptcy. Moreover, the maximum potential award under this metric is $257,500, yet emerging from chapter 11 within 90 days versus 180 days will substantially alleviate significant costs associated with administering these chapter 11 cases.

## III.    Basis for Relief.

Section 503(c) of the Bankruptcy Code, which provides criteria for payment of insiders and "other transfers or obligations that are outside the ordinary course of business," comprises three subsections: (1) a general prohibition against retention plans for insiders; (2) limitations on severance payments to insiders; and (3) standards governing "other transfers" to officers, managers and consultants that are outside of the ordinary course of business. Congress adopted section 503(c) of the Bankruptcy Code because it was concerned about <u>excessive</u> payments to <u>insiders</u> under employee retention plans. *See In re Dana Corp.*, 358 B.R. 567, 575 (Bankr. S.D.N.Y. 2006) (noting Congress's concern with the "glaring abuses of the bankruptcy system by the executives of giant companies like Enron Corp. and WorldCom, Inc. and Polaroid Corporation, who lined their pockets, but left . . . employees and retirees out in the cold.") (internal citations and quotation marks omitted). "[S]ection 503(c) was not intended to foreclose a chapter 11 debtor from *reasonably* compensating employees, including 'insiders,' for their contribution to the debtors' reorganization." *In re Nobex Corp.*, 2006 WL 4063024 (Bankr. D. Del. Jan. 19, 2006); *see also In re Werner Holding Co., Inc.*, Case No. 06-10578 (Bankr. D. Del. 2006) .

As a preliminary matter, section 503(c) of the Bankruptcy Code, which applies only to "insiders," does not apply to two of the Key Employees—Ms. Weekes and Mr. Savgur—

14

notwithstanding their job titles.  *See In re CEP Holdings, LLC*, 2006 WL 3422665, *3 (Bankr. N.D. Ohio 2006) (looking to employee's influence over the transaction at issue in determining employee was a person "in control" for purposes of section 503 of the Bankruptcy Code). Section 101(31) of the Bankruptcy Code provides that, in the event the debtor is a partnership, an "insider" is described as any of the following: general partner in the debtor; relative of a general partner in, general partner of, or person in control of the debtor; partnership in which the debtor is a general partner; general partner of the debtor; or person in control of the debtor.  *See* 11 U.S.C. § 101(31)(C)(i)-(v).[8]  Ms. Weekes and Mr. Savgur hold positions with SBX, a California limited partnership, and neither Ms. Weekes nor Mr. Savgur are a person "in control" of the Debtors. *See* Evans Declaration at ¶ 5.  More specifically, neither Ms. Weekes nor Mr. Savgur was appointed by the Board, neither Ms. Weekes nor Mr. Savgur has authority to make significant decisions independent of authorization and approval by CEO or CFO, neither Ms. Weekes nor Mr. Savgur has the ability to influence their compensation, and neither Ms. Weekes nor Mr. Savgur nor participates in decision-making by the Board.  Evans Declaration at ¶ 6; *cf. In re Foothills Texas, Inc.*, 408 B.R. 573, 580 (Bankr. D. Del. 2009) (citing "seminal case" defining "officers" of a debtor as "those in the collective group exercising overall authority regarding the debtor's corporate decisions who, as members of that insider group, are in a position to exert undue influence over corporate decisions regarding payment of their claims in tight financial times  including those who are privy to critical information regarding the debtor's financial stability and able to act to their advantage on the basis of such information."); *In re Public Access Technology*, 307 B.R. 500, 506 (E.D. Va. 2004) (stipulation

---

[8]   CTV is a California corporation.  Section 101(31) of the Bankruptcy Code provides that, in the event the debtor is a corporation, an "insider" is described as any of the following: director of the debtor; officer of the debtor; person in control of the debtor; partnership in which the debtor is a general partner; general partner of the debtor; relative of a general partner, director, officer, or person in control of the debtor.  Neither Ms. Weekes nor Mr. Savgur hold any position with CTV.

15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

that employee was an "Executive Vice President" not sufficient to find employee to be an "officer" within the meaning of 11 U.S.C. § 101(31)(B) when there were not affidavits, articles of incorporation, corporate minutes, resolutions, or any other documents showing that the title made employee an officer of the corporation).

### A.    The Incentive Program is Not A Retention Plan Under Section 503(c)(1).

The first subsection of section 503(c) of the Bankruptcy Code does not apply to the Incentive Program because the Incentive Program is not a retention program.  *See* 11 U.S.C. § 503(c)(1). Rather the Incentive Program is designed primarily to incentivize the Key Employees to achieve financial and restructuring objections that are important to the ongoing health of the Debtors' business and ensure that the Key Employees are fairly compensated for significant services during the Debtors' restructuring.  Evans Declaration at ¶ [29]; *see In re Dana Corp.*, 358 B.R. at 571 (noting that "merely because a plan has some retentive effect does not mean that the plan, overall, is retentive rather than incentivizing in nature"); *In re Global Homes Prods., LLC*, 369 B.R. 778, 785 (Bankr. D. Del. 2007) (finding that because plan was properly calculated to motivate management to produce and maximize the value of the debtors' estates section 503(c)(1) of the Bankruptcy Code did not apply).  Indeed, section 503(c)(1) applies only to true, "pay-to-stay" retention plans, not to plans, like the Incentive Program, that provide incentive compensation to employees for contributions to maximizing the value of the debtors' businesses.  *See*, *e.g.*, 11 U.S.C. § 503(c)(1); *Global Home Prods.*, 369 B.R. at 785 (holding that section 503(c) "was not intended to foreclose a chapter 11 debtor from reasonably compensating employees, including 'insiders,' for their contribution to the debtors' reorganization," and that plans that have an ancillary retentive effect are not retention plans subject to section 503 c)(1)) (emphasis omitted); *In re Nellson Nutraceutical, Inc.,* 369 B.R. 787, 802 (Bankr. D. Del. 2007) (finding that section 503(c)(1) applies only to retention programs with

16

"the <u>primary</u> purpose of inducing [an employee] to remain with the debtor's business.") (emphasis in original).

Further, the fact that the Incentive Program includes certain performance metrics that encompass time periods that have already passed and that will result in the Key Employees earning cash bonuses, does not transform the Incentive Program to a retention plan under section 503(c)(1). *See Global Home Prods.,* 369 B.R. at 786-87.  In *Global Home Products*, a creditor objected to the debtors' proposed management incentive plan, which provided participants the opportunity to earn cash bonus payments equal to a percentage of base salary upon the Debtors' achievement of EBITDA targets, because the plan included two plus quarters of the debtors' fiscal year that had already occurred and a portion of the third quarter.  The creditor, a labor union, argued that because the incentive plan covered past performance, there could be no incentive.  The court rejected that argument, finding:

> [T]he Plan's beneficiaries relied upon Debtors' historical practice of providing performance bonuses and that Debtors told the beneficiaries that they would ask the Court to approve the Plans. Thus, the beneficiaries were *performing* in response to a financial incentive and not merely to remain with Debtors.

*Global Home Prods.*, 369 B.R. at 787.  The *Global Products* Court went on to find:

> The Court is fully satisfied on the basis of the facts presented that Debtors are asking it to approve incentive, not retention plans and, therefore, § 503(c) does not come into play. Instead, the Court must determine if the Plans satisfy the business judgment and reasonableness standards.

Additionally, with respect to restructuring milestones, the court in *In re DURA Automotive Systems, Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. 2007) , approved an incentive plan based on three separate metrics, each of which had been partially or fully achieved at the time of approval: (a) delivery of a five-year business plan; (b) filing a chapter 11 plan of reorganization; and (c) confirmation of a chapter 11 plan of reorganization, subject to certain EBITDA targets.  In

17

approving these metrics after their achievement, the court recognized that the debtors' employees had been working with the reasonable belief that the metrics would be approved and their exemplary efforts rewarded.  In other words, the employees were *incentivized* to deliver excellent performance, not merely to stay in the debtors' employ.

Like the incentive plans at issue in *Global Home Products* and *Dura*, the Incentive Plan provides financial incentives to motive the Key Employees to produce and increase the value of the Debtors' estates, not retention-based payments.  The higher the Debtors' 2010 EBITDA—assuming above threshold-level performance— the more Cost Savings the Debtors achieve while completing the Projects on time, and the sooner the Debtors' emergence from chapter 11, the higher the Key Employees' incentive payments.  Conversely, failure to reach the threshold EBITDA levels, failure to complete the Projects on time <u>and</u> under-budget, or failure to emerge from chapter 11 within the 180-day window results in absolutely <u>no</u> payment at all under each corresponding metrics.  As this Court well knows, confirming a plan of reorganization and emerging from bankruptcy are not simple, nor easy, nor self-executing tasks.  In these chapter 11 cases, it will require a great deal of time, attention, and energy to negotiate with the Secured Financing Parties, the mechanics lien claimants, vendors, and other general unsecured creditors to reach a consensual plan of reorganization, which will necessarily involve persuading impaired creditors to compromise and equitize at least a portion of their debts and forgo other, more direct, means to monetize their claim.

As a result, the Incentive Program does not result in retention-type payments, which would reward the Key Employees solely for continued employment with the Debtors.  Instead, the payments are tied directly to the Debtors' performance, cost savings, and expeditious emergence from chapter 11, all of which are in the best interests of all stakeholders.  Moreover, payments under the Incentive Program are subject to the caps set forth with respect to the "maximum" level.

18

Further, like the incentive plan participants in *Global Home Products* and *Dura*, the Key Employees have been motivated by the Debtors' past practice of providing performance-based cash bonuses and were told that the Debtors would seek approval of an incentive plan during these chapter 11 cases. Evans Declaration at ¶¶ 7, 21. In that context, the Key Employees have worked diligently over the course of these chapter 11 cases to achieve and surpass Budgeted EBITDA (a financial metric established more than eight months ago) and to obtain a Tax Settlement that will maximize the value of the Debtors' estates for all stakeholders. *See* Evans Declaration at ¶¶ 7, 17.

As a result of the Key Employees' stewardship of the Debtors' estates, the Debtors' estates have experienced a tangible postpetition benefit. Indeed, in addition to the Tax Settlement, the Debtors have managed to increase revenue and achieve project completion savings since the filing of these cases—both of which have required extensive efforts by the Key Employees during the course of these chapter 11 cases. Evans Declaration at ¶ 16. Thus, this Court should find that the Incentive Program is not subject to section 503(c)(1) of the Bankruptcy Code. *See Global Home Products*, 369 B.R. at 785; *see also Dana Corp.*, 358 B.R. at 584 ("[b]y presenting an executive compensation package that properly [motivates the CEO and senior executives] to produce and increase the value of the estate, the [debtor has] established that section 503(c)(1) does not apply to [the debtor's motion].").

**B.      The Incentive Program Is Not A Severance Plan Under Section 503(c)(2).**

Similarly, section 503(c)(2) of the Bankruptcy Code, which prohibits severance payments that are administrative expenses, does not apply to the Incentive Program because the Incentive Program does not provide benefits triggered by termination of employment. *See* 11 U.S.C. § 503(c)(2); *In re Journal Register Co.*, 407 B.R. 520, 536 (Bankr. S.D.N.Y. 2009) (finding that section 503(c)(2) of the Bankruptcy Code did not apply where bonus payments were not triggered by a termination of employment event) (citing *Dana Corp.,* 358 B.R. at 578).

19

### C.    The Incentive Program Is An Exercise of the Debtors Reasonable Business Judgment Under Section 503(c)(3).

Finally, the Incentive Bonuses are appropriate and permissible under section 503(c)(3) of the Bankruptcy Code because section 503(c)(3) of the Bankruptcy Code prohibits only transfers that are outside the ordinary course of business and that are not justified by the facts and circumstances of the case.  *See* 11 U.S.C. § 503(c)(3); *see also Dana Corp.*, 358 B.R. at 576 (finding that the section 503(c)(3)  standard is "nothing more than a reiteration of the standard under 363 under which courts had previously authorized transfers outside the ordinary course of business based on the business judgment of the debtor") (citing *In re Nobex Corp.*, 2006 WL 4063024 (Bankr. D. Del. Jan. 19, 2006)); *but see In re Pilgrim's Pride Corp.*, 401 B.R. 229 (Bankr. N.D. Tex. 2009) (finding that section 503(c)(3) contemplates heightened business judgment standard).

As discussed herein, implementing the Incentive Program is an exercise of the Debtors' sound business judgment.  As articulated by the court in *Dana Corp.*, courts consider the following factors in determining if the structure of a compensation proposal and the process for developing the proposal meet the "sound business judgment" test and is justified by the facts and circumstances: (1) whether there is a reasonable relationship between the plan proposed and the results to be obtained; (2) whether the cost of the plan is reasonable in the context of the debtor's assets, liabilities, and earning potential; (3) whether the scope of the plan fair and reasonable; (4) whether the plan or proposal is consistent with industry standards; (5) the nature of the due diligence efforts of the debtor in investigating the need for a plan; and (6) whether the debtor received independent counsel in performing due diligence and in creating and authorizing the incentive compensation.  *See Dana Corp.*, 358 B.R. at 576-77.

The Incentive Program satisfies all of the inquiries articulated in *Dana*.  **First**, the Incentive Program ties bonus awards directly to the results to be obtained.  **Second**, the maximum potential cost of $681,800 represents less than 0.1% of the Debtors outstanding liabilities as of the Petition

20

Date and is less than the total bonuses provided under the Key Employees' prepetition employment contracts, which were approved by the Board and the Secured Financing Parties.[9]  Warshauer Declaration at ¶ 13; *see* Evans Declaration at ¶¶ 9, 11.  **Third**, the scope of the Incentive Program fairy includes the employees in a position to most influence the Debtors' financial performance and each of the employees for whom the Debtors provided incentive bonus opportunities prepetition.  **Fourth**, the Incentive Program provides for compensation consistent with other single asset toll road operators and similarly-sized chapter 11 debtors.  **Fifth** and **Sixth**, the Board, with the assistance of the Debtors' experienced advisors, formulated the Incentive Program after considering the substantial additional work that the Key Employees have performed and will continue to perform while the Debtors move through the chapter 11 process, the elevated level of uncertainty regarding the Key Employees' future employment with the Debtors, and the needs of the Debtors' business.  In addition, the Board and the Debtors' advisors conducted a comprehensive assessment of the Debtors' compensation practices and the compensation practices of other single asset toll road operators and debtors and contemplated several alternative designs for incentivizing the Key Employees to increase the value of the Debtors' estates.  *See* Evans Declaration at ¶¶ 19-20; Warshauer Declaration at ¶¶ 15-19.

Moreover, like the incentive plan in *Global Home Products,* the Incentive Program metrics are tied to the Debtors' Budget and Project Completion Budget, both of which were approved by the Secured Financing Parties, whose cash collateral is at risk and whose financial acumen is apparent. *See Global Home Products*, 369 B.R. 787; *see* Evans Declaration at ¶¶ 15, 28.

---

[9]   This amount does not include claims asserted by Otay River Constructors in connection with the lien priority litigation.

21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Additionally, the Debtors note that the Incentive Program does not provide insiders the type of "excessive payments" that Congress intended section 503(c) to prevent. *See Dana Corp.*, 358 B.R. at 575 ("[S]ection 503(c) was not intended to foreclose a chapter 11 debtor from *reasonably* compensating employees, including "insiders," for their contribution to the debtors' reorganization.") (emphasis in original) (internal citations omitted).  Far from overcompensating the Key Employees, the Incentive Program will enable the Key Employees to receive compensation that is consistent with market.  *See* Warshauer Declaration at ¶ 21.  Payments under the Incentive Program are not only reasonable and appropriate, but also necessary, to properly compensate and incentivize the Key Employees and to ensure the Debtors' successful reorganization.  *See* Evans, Declaration at ¶ 31; Warshauer Declaration at ¶ 23.

Courts in this and other jurisdictions have recognized incentive compensation programs like the one proposed herein as an efficient means of maximizing value for a debtor's estate and achieving restructuring goals.  *See*, *e.g.*, *In re Bordier's Nursery, Inc.*, No. 08-18501 (Bankr. C.D. Cal. May 13, 2009)  (authorizing the debtors to pay incentive bonuses to two executives); *In re Am. W. Airlines, Inc.*, 171 B.R. 674, 677 (Bankr. D. Ariz. 1994) (noting the "trend in large successful companies within and out of Bankruptcy" of relating the size of a bonus to the success of the company and approving bonuses for employees who helped the debtors navigate through the confirmation process to be a proper exercise of the debtors' business judgment); *see also In re Global Home Prods., LLC*, 369 B.R. at 784 ("The reasonable use of incentives and performance bonuses [is] considered the proper exercise of a debtor's business judgment.").

For these reasons, the Debtors respectfully submit that they have demonstrated a sound business purpose for implementing the Incentive Program, the Incentive Bonuses are more than justified by the facts and circumstances of this case and, accordingly, the Incentive Program is permissible under section 503(c)(3).

K&E 17130321

1  WHEREFORE, the Debtors respectfully request an entry of an order, substantially in the

2  form attached hereto as **Exhibit A**, (a) authorizing the implementation of the Incentive Program and

3  (b) granting such other further relief as is just and proper.

4  Dated: August 23, 2010                    /s/ *R. Alexander Pilmer*
   San Diego, California                      R. Alexander Pilmer (CA 166196)
5                                             **KIRKLAND & ELLIS LLP**
                                              333 South Hope Street
6                                             Los Angeles, California  90071
                                              Telephone:    (213) 680-8400
7                                             Facsimile:    (213) 680-8500

8                                             James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
9                                             Marc Kieselstein, P.C. (admitted *pro hac vice*)
                                              Chad J. Husnick (admitted *pro hac vice*)
10                                            Meredith L. Shafe (admitted *pro hac vice*)
                                              **KIRKLAND & ELLIS LLP**
11                                            300 North LaSalle Street
12                                            Chicago, Illinois  60654
                                              Telephone:    (312) 862-2000
13                                            Facsimile:    (312) 862-2200

14                                            Attorneys for the Debtors
15                                            and Debtors in Possession

16

17

18

19

20

21

22

23

24

25

26

27

28

K&E 17130321

# EXHIBIT A

**Proposed Order**

R. Alexander Pilmer (CA 166196)
**KIRKLAND & ELLIS LLP**
333 South Hope Street
Los Angeles, California  90071
Telephone:   (213) 680-8400
Facsimile:    (213) 680-8500

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Meredith L. Shafe (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
300 North LaSalle Street
Chicago, Illinois  60654
Telephone:   (312) 862-2000
Facsimile:    (312) 862-2200

Attorneys for the Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
SOUTHERN DISTRICT OF CALIFORNIA
325 West "F" Street, San Diego, California  92101-6991

| | |
|---|---|
| In re:<br><br>SOUTH BAY EXPRESSWAY, L.P. and CALIFORNIA TRANSPORTATION VENTURES, INC.,<br><br>Debtors. | BANKRUPTCY NO.  10-04516-LA11<br><br>Date of Hearing:  September 23, 2010<br>Time of Hearing: 2:30 p.m. (Pacific Time)<br>Name of Judge:   Hon. Louise D. Adler |

**ORDER ON**

Motion of the Debtors for Entry of an Order Authorizing the Implementation of a Key Employee Incentive Program

IT IS ORDERED THAT the relief sought as set forth on the continuation pages and numbered 2 through 2, with exhibits, if any, for a total of __ pages, is granted.  Motion Docket Entry No. _____.

Signature by the attorney constitutes a certification under Fed. R. Bankr. P. 9011 that the relief on the Order is the relief granted by the Court.

_____
Judge, United States Bankruptcy Court

Submitted by:

Kirkland & Ellis LLP
_____
(Firm Name)

By:   *R. Alexander Pilmer*
        _____
        Attorney for  ☒ Movant  ☐ Respondent

ORDER ON:  Motion of the Debtors for Entry of an Order Authorizing the Implementation of a Key Employee Incentive Program
DEBTORS:  South Bay Expressway, L.P. and California Transportation Ventures, Inc.
CASE NO:  10-04516-LA11

Upon the motion (the "Motion")[1] of the above-captioned debtors (collectively, the "Debtors") for entry of an order (the "Order") authorizing, but not directing, the Debtors to implement the Debtors' proposed key employee incentive program (the "Incentive Program"); and upon the Evans Declaration and the Warshauer Declaration; and the Court having found that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Debtors having provided appropriate notice of the Motion and the opportunity for a hearing on this Motion under the circumstances and no other or further notice need be provided; and the Court having reviewed the Motion, the Evans Declaration, and the Warshauer Declaration; and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; after due deliberation and sufficient cause appearing therefor,

IT IS SO ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      The Incentive Program is approved in all respects.

3.      The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

4.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

IT IS SO ORDERED.

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

2

## **EXHIBIT 1**

**Summary of Incentive Program**

## Summary of Key Employee Incentive Program for

The key employee incentive program (the "Incentive Program") contemplates performance incentive payments to the four employees (each, a "Key Employee"), listed below:

- Greg Hulsizer – Chief Key Employee Officer
- Anthony Evans – Chief Financial Officer
- Theresa Weeks – Chief Accounting Officer
- Shane Savgur – Chief Technology Officer

Performance incentive payments will be based on performance of South Bay Expressway, L.P. and California Transportation Ventures, Inc. (together, the "Debtors"), as measured by (1) the 2010 operating budget ("Budgeted EBITDA") approved by the board of directors (the "Board") and the Debtors' senior secured lenders (the "Secured Financing Parties") and attached hereto as Exhibit 1(a); (2) the project completion budget approved by the Board and the Secured Financing Parties ("Project Completion Budget") approved by the Board and the Secured Financing Parties and attached hereto as Exhibit 1(b); (3) the timing of the Debtors' emergence from chapter 11 protection.

Notwithstanding the criteria below, under no circumstances will the total incentive payments due to any of the Key Employees in a calendar year exceed 100% of his or her base salary.

***Performance Metric #1:  Operating Cash Flows***
*Relevant parties: Greg Hulsizer, Anthony Evans, Theresa Weeks, Shane Savgur*

Performance will be based on EBITDA, as shown in the original 2010 budget approved by the board of directors, inclusive of any property tax refunds.  The operating cash flow metric will not include Key Employee bonuses contemplated in this memorandum, project completion costs or restructuring costs, including professional fees.  These operating cash flow incentive payments will be measured and paid annually.

Each Key Employee will have a Target Bonus, which is calculated as a percentage of their base salary, as show in the table below:

| Key Employee | Target Bonus as % of Base Salary | Target Bonus as Cash Amount |
|---|---|---|
| Greg Hulsizer | 50% | $137,500 |
| Anthony Evans | 50% | $120,000 |
| Theresa Weekes | 40% | $55,600 |
| Shane Savgur | 40% | $55,600 |
| | **Target Bonus Pool:** | **$368,700** |

1

As summarized in the table below, should actual EBITDA exceed Budgeted EBITDA, the incremental bonus pool available to the Key Employees will equal 15% of the incremental EBITDA. The incentive pool will be allocated to the Key Employees and added to their respective Target Bonuses according to base salaries. To the extent Actual EBITDA is less than budgeted EBITDA, each Key Employee's Target Bonus will be reduced by 30% of the deficiency, again allocated according to respective base salaries.

Each Key Employee's maximum bonus under Performance Metric #1 will be equal to 150% of his or her Target Bonus. If actual EBITDA is less than 90% of Budgeted EBITDA, no incentive payments will be made.

| Key Employee | Maximum Cash Award |
|---|---|
| Greg Hulsizer | $206,250 |
| Anthony Evans | $180,000 |
| Theresa Weekes | $83,400 |
| Shane Savgur | $83,400 |
| Total: | $553,050 |

### Performance Metric #2: Project Completion Cost
*Relevant parties: Greg Hulsizer, Anthony Evans*

Performance will be based on the cost to complete required capital expenditures versus the budgeted amounts. The pool available to the CEO and CFO will be calculated as a percentage of budgeted costs minus actual costs incurred. If the cost to complete the required projects exceeds the budgeted amounts, there will be no payouts.

At the end of the bonus period, 15% of the net cost savings ("Cost Savings") will be included in the bonus pool. The Cost Savings will be the cumulative net total of the permanent cost savings and permanent cost increases calculated by looking at the work completed on each individual project (line item on the Project Completion Budget). Expenditures deferred beyond 2010 will not constitute permanent savings and will not be included in the bonus calculation. The Cost Savings will be determined by the Board, subject to concurrence by the Secured Financing Parties' technical advisor, which shall not be unreasonably withheld or delayed.

For those individual projects which are required under the Development Franchise Agreement to be completed prior to December 31, 2010, in order for the cost savings to be included in the Cost Savings calculation they must be completed by December 31, 2010. However, permanent cost increases on these projects will be netted against cost savings. To the extent the Board determines that an individual project has been delayed by either Caltrans or the Secured Financing Parties and will not be completed by December 31, 2010 through no fault of the CEO and CFO, permanent savings on this project will remain eligible for inclusion in the Cost Savings calculation.

2

To the extent pre-petition costs incurred under the Project Completion Budget were not paid and have become unsecured claims, the Cost Savings calculation will exclude any implied savings as a result of the bankruptcy filing.

The allocation of the bonus pool is shown in the table below:

| Project Completion Cost Savings Payout Allocation | |
|---|---|
| Greg Hulsizer | 50% |
| Anthony Evans | 50% |

***Performance Metric #3:  Emergence***
*Relevant parties: Greg Hulsizer, Anthony Evans*

In addition to the EBITDA and project completion cost incentive metrics, there will be an emergence incentive program specifically designed to incentivize the CEO and CFO to expeditiously emerge from Chapter 11.  As set forth in the chart below, the payout levels will be based on the length of time from the entry of an order by the United States Bankruptcy Court for the Southern District of California determining the priority of liens asserted by the Secured Financing Parties, Otay River Constructors, and InTranS Group, Inc.

| Emergence after Resolution of Priority Dispute | Cash Award as % of Base Salary |
|---|---|
| Within 90 days | 50% |
| Within 135 days | 25% |
| Within 180 days | 10% |
| **Maximum Total Awards:** | **$257,500** |

## **EXHIBIT 1(a)**

**Budget**

**2010 Operating Budget**
*($ in thousands)*

| Description | Jan-10 | Feb-10 | Mar-10 | Apr-10 | May-10 | Jun-10 | Jul-10 | Aug-10 | Sep-10 | Oct-10 | Nov-10 | Dec-10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Budget | | | | | | | |
| Days | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 | 365 |
| **Traffic (000s)** | | | | | | | | | | | | | |
| ETC | 457 | 490 | 550 | 534 | 558 | 530 | 534 | 534 | 546 | 562 | 512 | 546 | 6,352 |
| Violations | 28 | 27 | 30 | 29 | 30 | 28 | 29 | 29 | 29 | 30 | 27 | 29 | 344 |
| Unmatched | 28 | 27 | 22 | 18 | 15 | 14 | 14 | 14 | 15 | 15 | 14 | 15 | 211 |
| Cash | 134 | 129 | 143 | 138 | 143 | 136 | 137 | 137 | 140 | 144 | 131 | 140 | 1,651 |
| **Total** | 647 | 673 | 746 | 718 | 745 | 708 | 713 | 714 | 730 | 751 | 684 | 729 | 8,557 |
| | | | | | | | | | | | | | |
| **Average Daily Traffic (000s)** | 20.9 | 24.0 | 24.1 | 23.9 | 24.0 | 23.6 | 23.0 | 23.0 | 24.3 | 24.2 | 22.8 | 23.5 | 23.4 |
| | | | | | | | | | | | | | |
| **Revenue ($000s)** | | | | | | | | | | | | | |
| ETC Annual Revenue | 1,088 | 1,166 | 1,310 | 1,271 | 1,327 | 1,261 | 1,270 | 1,272 | 1,300 | 1,337 | 1,218 | 1,299 | 15,117 |
| Violations | 95 | 91 | 101 | 98 | 101 | 96 | 97 | 97 | 99 | 102 | 93 | 99 | 1,171 |
| Unmatched | 66 | 64 | 53 | 43 | 35 | 34 | 34 | 34 | 35 | 36 | 33 | 35 | 501 |
| Cash Annual Revenue | 480 | 463 | 513 | 494 | 513 | 487 | 491 | 492 | 502 | 517 | 471 | 502 | 5,926 |
| **Gross Potential Revenue** | 1,729 | 1,784 | 1,978 | 1,905 | 1,977 | 1,878 | 1,892 | 1,894 | 1,936 | 1,992 | 1,814 | 1,935 | 22,715 |
| Promotions | (8) | (8) | (8) | (7) | (7) | (7) | (7) | (6) | (6) | (6) | (6) | (6) | (82) |
| Violations/unmatched | (161) | (156) | (155) | (140) | (137) | (130) | (131) | (131) | (134) | (138) | (126) | (134) | (1,672) |
| Toll Revenue | 1,560 | 1,621 | 1,815 | 1,758 | 1,833 | 1,741 | 1,754 | 1,757 | 1,796 | 1,848 | 1,682 | 1,795 | 20,961 |
| | | | | | | | | | | | | | |
| Other Revenue | 230 | 230 | 230 | 230 | 230 | 230 | 230 | 230 | 230 | 230 | 230 | 230 | 2,760 |
| | | | | | | | | | | | | | |
| **TOTAL REVENUE ($000s)** | 1,790 | 1,851 | 2,045 | 1,988 | 2,063 | 1,971 | 1,984 | 1,987 | 2,026 | 2,078 | 1,912 | 2,025 | 23,721 |
| | | | | | | | | | | | | | |
| Operating Costs | 822 | 817 | 1,091 | 874 | 815 | 1,160 | 817 | 836 | 843 | 789 | 855 | 953 | 10,673 |
| | | | | | | | | | | | | | |
| Property Tax | 0 | 0 | 0 | 398 | 0 | 0 | 0 | 0 | 90 | 0 | 0 | 2,348 | 2,836 |
| | | | | | | | | | | | | | |
| Interest Received | (1) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (34) |
| | | | | | | | | | | | | | |
| **TOTAL OPERATING COSTS Pre Interest ($000s)** | 821 | 814 | 1,087 | 1,269 | 813 | 1,157 | 814 | 833 | 930 | 786 | 853 | 3,298 | 13,475 |
| | | | | | | | | | | | | | |
| **OPERATING REVENUE PRE INTEREST ($000s)** | 970 | 1,037 | 958 | 719 | 1,250 | 814 | 1,170 | 1,154 | 1,096 | 1,291 | 1,060 | (1,273) | 10,246 |
| | | | | | | | | | | | | | |
| **EXTRAORDINARY PROFESSIONAL FEES ($000s)** | 500 | 500 | 250 | 250 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,500 |
| | | | | | | | | | | | | | |
| INTEREST ($000s) | 4,827 | 0 | 0 | 4,827 | 0 | 0 | 4,827 | 0 | 0 | 4,827 | 0 | 0 | 19,308 |
| | | | | | | | | | | | | | |
| NET CASH FLOW ($000s) | (4,357) | 537 | 708 | (4,358) | 1,250 | 814 | (3,657) | 1,154 | 1,096 | (3,536) | 1,060 | (1,273) | (10,562) |
| | | | | | | | | | | | | | |
| EBITDA | 968 | 1,034 | 955 | 716 | 1,247 | 812 | 1,167 | 1,151 | 1,093 | 1,288 | 1,057 | (1,276) | 10,213 |
| | | | | | | | | | | | | | |
| **EBITDA (net of Key Employee bonus payments)** | 968 | 1,034 | 1,019 | 716 | 1,247 | 1,133 | 1,167 | 1,151 | 1,157 | 1,288 | 1,057 | (1,156) | 10,784 |

# **EXHIBIT 1(b)**

## **Project Completion Budget**

**PROJECT COMPLETION BUDGET - Cash Flow - Sect 4 (c)**
As of December 31, 2009

| # | | Payee | TOTAL $000s | Jan-10 $000s | Feb-10 $000s | Mar-10 $000s | Apr-10 $000s | May-10 $000s | Jun-10 $000s | Jul-10 $000s | Aug-10 $000s | Sep-10 $000s | Oct-10 $000s | Nov-10 $000s | Dec-10 $000s | Jun-11 $000s | Dec-11 $000s | Jun-12 $000s | Dec-12 $000s | Jun-13 $000s | Dec-13 $000s | Jun-14 $000s | Dec-14 $000s | TOTAL $000s |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **2.1 Outstanding Capital Works and Associated Support Costs** | | | | | | | | | | | | | | | | | | | | | | | |
| 2 | **2.1.1 Gap-Connector** | | | | | | | | | | | | | | | | | | | | | | | |
| 3 | Golf Course Bridge Construction | Hazard | 123 | 87 | 36 | | | | | | | | | | | | | | | | | | | 123 |
| 4 | Golf Course Bridge Design Support/As-builts | Rick Eng | 10 | 5 | 5 | | | | | | | | | | | | | | | | | | | 10 |
| 5 | Manzana Basin Maintenance Access Road | Hazard | 53 | | 53 | | | | | | | | | | | | | | | | | | | 53 |
| 6 | Additional Fencing | Hazard | 5 | | 5 | | | | | | | | | | | | | | | | | | | 5 |
| 7 | Irrigation Reveg Sites | Otay Water | 60 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 60 |
| 8 | Plant Establishment | Diversified | 275 | 95 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | | | | | | | | | | | 275 |
| 10 | **2.1.2 Toll Road** | | | | | | | | | | | | | | | | | | | | | | | |
| 11 | Punch List | TBD | 40 | | | 40 | | | | | | | | | | | | | | | | | | 40 |
| 12 | Plant Establishment | ValleyCrest | 381 | 15 | 15 | 15 | 15 | 15 | 14 | 15 | 15 | 15 | 15 | 15 | 14 | 88 | 115 | | | | | | | 381 |
| 13 | Irrigation Plant Establishment | Otay Water | 311 | 35 | 23 | 23 | 55 | 33 | 39 | 29 | 33 | 8 | 22 | 11 | | | | | | | | | | 311 |
| 14 | Phone Line Relocation - Otay Mesa Road | AT&T | 220 | 220 | | | | | | | | | | | | | | | | | | | | 220 |
| 15 | **2.1.3 Park Betterments** | | | | | | | | | | | | | | | | | | | | | | | |
| 16 | Contract Work | TBD | 4,500 | 225 | 350 | 455 | 500 | 500 | 500 | 500 | 400 | 400 | 200 | 20 | 450 | | | | | | | | | 4,500 |
| 17 | Contingency for Cos - 5% | TBD | 225 | 0 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 5 | | | | | | | | 225 |
| 18 | Design Support/As-builts | Rick Enginering | 50 | | 5 | | | | | | | | | | | 20 | 25 | | | | | | | 50 |
| 19 | Construction Management - 5% | PTG/Gateway | 225 | 10 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 10 | 5 | | | | | | | | 225 |
| 20 | **2.1.4 Fixed Operating Equipment (FOE)** | | | | | | | | | | | | | | | | | | | | | | | |
| 21 | FOE Contract | InTranS | 0 | | | | | | | | | | | | | | | | | | | | | 0 |
| 22 | TMS Integration with Caltrans | Astart | 14 | | | | 14 | | | | | | | | | | | | | | | | | 14 |
| 23 | High Availability Support System | Dell/EMC | 80 | 40 | | | 40 | | | | | | | | | | | | | | | | | 80 |
| 24 | Construction Management | Transtoll | 272 | 62 | 60 | 30 | 30 | 30 | 30 | 30 | | | | | | | | | | | | | | 272 |
| 25 | Rehab Phase 1 | Transtoll | 863 | | 100 | 200 | 200 | 200 | 163 | | | | | | | | | | | | | | | 863 |
| 26 | Rehab Phase 2 - If Needed | Transtoll | 1,000 | | | | | | 50 | 200 | 200 | 200 | 200 | 150 | | | | | | | | | | 1,000 |
| 27 | Fiber Across Bridge | TBD/Berg | 50 | | | | 50 | | | | | | | | | | | | | | | | | 50 |
| 28 | Independent 3rd Party Advisor | IBI Group | 11 | 11 | | | | | | | | | | | | | | | | | | | | 11 |
| 29 | **2.1.5 Other Capital Work** | | | | | | | | | | | | | | | | | | | | | | | |
| 30 | Segment 1A Point of Conection (POC) | Water District/TBD | 352 | | 176 | 176 | | | | | | | | | | | | | | | | | | 352 |
| 31 | Turnarounds on Toll Road Mainline | TBD | 60 | | | | 60 | | | | | | | | | | | | | | | | | 60 |
| | **2.2 Right of Way (ROW) Costs** | | | | | | | | | | | | | | | | | | | | | | | |
| 33 | **2.2.1 Offsite Environmental Mitigation Properties** | | | | | | | | | | | | | | | | | | | | | | | |
| 34 | Proctor Valley & Bonita Meadows (Buie) | Caltrans | 275 | | 275 | | | | | | | | | | | | | | | | | | | 275 |
| 36 | Lake Jennings (Carroll & Jenkins parcels) | Caltrans | 122 | | 122 | | | | | | | | | | | | | | | | | | | 122 |
| 37 | SDG&E offset | SBX | -106 | | (106) | | | | | | | | | | | | | | | | | | | (106) |
| 38 | **2.2.2 ROW Professional Services** | | | | | | | | | | | | | | | | | | | | | | | |
| 39 | TR Excess Property Mapping and Legal Descriptions | PDC | 8 | 2 | 2 | 2 | 2 | | | | | | | | | | | | | | | | | 8 |
| 40 | TR Excess Property Mapping and Legal Descriptions | Berggeran | 38 | 10 | 10 | 10 | 8 | | | | | | | | | | | | | | | | | 38 |
| 41 | G/C ROW Acquisition for Easements | PDC | 22 | 5 | 5 | 5 | 2 | 2 | 3 | | | | | | | | | | | | | | | 22 |
| 42 | G/C ROW Mapping and Legal Descriptions | Berggeran | 5 | | 5 | | | | | | | | | | | | | | | | | | | 5 |
| 43 | Legal Fees - including Ellis Arbitration | Weule, Nossaman | 58 | 33 | 5 | 5 | 5 | 5 | 5 | | | | | | | | | | | | | | | 58 |
| 44 | Misc Recording Fees | | 15 | 2 | 3 | 2 | 3 | 2 | 3 | | | | | | | | | | | | | | | 15 |
| 45 | **2.3 Environmental Mitigation** | | | | | | | | | | | | | | | | | | | | | | | |
| 46 | G/C Environmental Mitigation | EDAW | 227 | 32 | 32 | 29 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 14 | 14 | 14 | 13 | 13 | 13 | 13 | 13 | 227 |
| 47 | TR Onsite Mitigation Monitoring | EDAW | 20 | 5 | 5 | 5 | 5 | | | | | | | | | | | | | | | | | 20 |
| 48 | Dante Property Environmental Remediation Monitoring | Leighton | 100 | | 50 | 50 | | | | | | | | | | | | | | | | | | 100 |
| 49 | **2.4 Other** | | | | | | | | | | | | | | | | | | | | | | | |
| 50 | Overhead | SBX | 0 | | | | | | | | | | | | | | | | | | | | | 0 |
| 51 | Insurance (OCIP) | Zurich | 2,725 | 20 | | | 1,955 | | | | | | | | | | 750 | | | | | | | 2,725 |
| 52 | SBX Construction Management | Various | 320 | 27 | 22 | 22 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 27 | 62 | 24 | | | | | | | 320 |
| 53 | Caltrans Oversight | Caltrans | 222 | 132 | 10 | 10 | 10 | 10 | 10 | 5 | 5 | 5 | 5 | 5 | 10 | | | | | | | | | 222 |
| 54 | | | | | | | | | | | | | | | | | | | | | | | | |
| 55 | Subtotal | | 13,231 | 1,074 | 1,329 | 1,140 | 3,035 | 878 | 898 | 860 | 734 | 709 | 523 | 262 | 550 | 215 | 909 | 20 | 19 | 19 | 19 | 19 | 19 | 13,231 |
| 56 | Contingency 10% | | 1,323 | 107 | 133 | 114 | 304 | 88 | 90 | 86 | 73 | 71 | 52 | 26 | 55 | 22 | 91 | 2 | 2 | 2 | 2 | 2 | 2 | 1,323 |
| 57 | Total | | 14,554 | 1,181 | 1,462 | 1,254 | 3,339 | 966 | 988 | 946 | 807 | 780 | 575 | 288 | 605 | 237 | 1,000 | 22 | 21 | 21 | 21 | 21 | 21 | 14,554 |

**<u>EXHIBIT B</u>**

1  R. Alexander Pilmer (CA 166196)
   **KIRKLAND & ELLIS LLP**
2  333 South Hope Street
   Los Angeles, California  90071
3  Telephone:     (213) 680-8400
   Facsimile:     (213) 680-8500
4

5  James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
   Marc Kieselstein, P.C. (admitted *pro hac vice*)
6  Chad J. Husnick (admitted *pro hac vice*)
   Meredith L. Shafe (admitted *pro hac vice*)
7  **KIRKLAND & ELLIS LLP**
8  300 North LaSalle Street
   Chicago, Illinois  60654
9  Telephone:     (312) 862-2000
   Facsimile:     (312) 862-2200
10

11 Attorneys for the Debtors
   and Debtors in Possession

12
                **UNITED STATES BANKRUPTCY COURT**
13               **SOUTHERN DISTRICT OF CALIFORNIA**

14 | In re: | Chapter 11 |
15 | | Case No. 10-04516-LA11 |
   | SOUTH BAY EXPRESSWAY, L.P. and | |
16 | CALIFORNIA TRANSPORTATION | (Joint Administration Requested with |
   | VENTURES, INC.,[1] | Case No. 10-04518) |
17 | | |
   | Debtors. | **DECLARATION OF ANTHONY G. EVANS** |
18 | | **IN SUPPORT OF THE MOTION OF THE** |
   | | **DEBTORS FOR ENTRY OF AN ORDER** |
19 | | **AUTHORIZING THE IMPLEMENTATION** |
   | | **OF KEY EMPLOYEE INCENTIVE PLAN** |
20

21

22

23

24

25

26
   ---
27 [1]  Pursuant to section 342(c)(1) of title 11 of the United States Code, the last four digits of each debtor's federal tax
        identification number are:  South Bay Expressway, L.P. (9083) and California Transportation Ventures, Inc. (5119).
28      The location of the debtors' corporate headquarters and the debtors' service address is:  1129 La Media Road, San
        Diego, California  91914.

I, ANTHONY G. EVANS, declare and state as follows:

1.      I serve as the Chief Financial Officer ("CFO") for South Bay Expressway, L.P., a California Limited Partnership ("SBX," and together with California Transportation Ventures, Inc. ("CTV"), the "Debtors").

2.      I submit this declaration in support of the *Motion of the Debtors for Entry of an Order Authorizing the Implementation of Key Employee Incentive Plan* (the "Motion").[2]  I am familiar with the contents of the Motion and the proposed incentive program (the "Incentive Program") for the following four employees of the Debtors: (a) Greg Hulsizer, the Debtors' Chief Executive Officer (the "CEO"); (b) myself, the Debtors' Chief Financial Officer (the "CFO"); (c) Theresa Weekes, the Debtors' Chief Accounting Officer ("CAO"); and (d) Shane Savgur, the Debtors' Chief Technology Officer ("CTO") (collectively, the "Key Employees").

3.      In my opinion, the metrics included in the Incentive Program have motivated and will continue to motivate the Key Employees to perform and increase the value of the Debtors' estates during these chapter 11 cases by rewarding the Key Employees for outstanding performance. Accordingly, and for the reasons stated below, in my opinion, approval of the Incentive Program will maximize value for all stakeholders in the Debtors' chapter 11 cases.

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information I have received from other members of the Debtors' management or the Debtors' advisors.  I am authorized to submit this declaration on behalf of the Debtors and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.  I submit this declaration under penalty of perjury pursuant to 28 U.S.C. § 1746.

---

[2]    All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

K&E 17348722.7

**I.      The Key Employees.**

5.      Each of the Key Employees is employed by SBX.

6.      Neither Ms. Weekes nor Mr. Savgur was appointed by the Debtors' board of directors (the "Board"), neither Ms. Weekes nor Mr. Savgur has authority to make significant decisions independent of authorization and approval by the Mr. Hulsizer, as CEO, or myself, as CFO, neither Ms. Weekes nor Mr. Savgur has the ability to influence their compensation, and neither Ms. Weekes nor Mr. Savgur participates in decision-making by the Board.

**A.      Compensation of the Key Employees.**

7.      In the past and immediately prior to the Petition Date, pursuant to employment agreements, the Key Employees were provided with opportunities to earn cash bonuses upon achieving financial goals set forth in annual budgets approved by the Board.  These bonus opportunities, which are summarized generally below, have motivated the Key Employees to perform at a superlative level and increase the value of the Debtors' business.

**1.      CEO and CFO.**

8.      Historically, the Debtors provided their CEO and CFO the opportunity to earn cash bonuses on account of project milestones and continued employment with the Debtors.  The CEO and CFO were hired, in large part, to oversee the Debtors' construction of the Expressway and, as such, bonus milestones were structured around construction completion milestones to incentivize those Key Employees toward an expeditious opening of the Expressway.  For the CEO, individual cash awards ranged from $75,000 for construction milestones to $250,000 for the opening of the Expressway, with annual bonuses thereafter in the amount of 30% of the CEO's annual base salary. For the CFO, individual cash awards ranged from in 25% of annual base salary for financing and construction milestones to 100% of annual base salary for the opening of the Expressway.

9.      Immediately prior to the Petition Date, for the year 2010, the CEO and CFO were

compensated pursuant to their respective employment agreements with the Debtors, which were approved by the Board and the Secured Financing Parties.  Under those employment contracts, annual compensation for the CEO and CFO was structured such that each individual would receive his total annual compensation in the form of (a) a base salary, paid monthly; (b) semi annual retention bonus payments, payable on June 30, 2010, and December 31, 2010, that together amounted to 100% of respective base salary; and (c) performance based bonuses in an aggregate amount 50% of respective annual salary, payable quarterly upon achievement of Budgeted EBITDA and certain completion and operational metrics.  Accordingly, as of the Petition Date, the CEO and CFO stood to earn cash bonus payments of up to 150% of their respective annual base salary.  As a result of the Debtors' chapter 11 filing, the Debtors have not paid any cash bonus payments to the CEO and CFO during the postpetition period.

### 2.    CAO and CTO.

10.    Historically, the Debtors provided the CAO and CTO with opportunities for cash bonuses, though on a more limited basis than the CEO and CFO.  This difference reflects the broader control and authority of the CEO and CFO as compared to the limited authority of the CAO and CTO who are subject to the supervision and authority of the CEO and CFO.  With respect to the CTO, Mr. Savgur was hired during the construction of the Expressway.  As such, he was eligible for a cash bonus of $20,000 for opening of the Expressway.  In addition, Mr. Savgur was eligible for an annual cash bonus of up to 15% of annual base salary.  With respect to the CAO, Ms. Weekes was hired after the opening of the Expressway.  She was eligible for an annual cash bonus of up to 20% of annual base salary.  Both Ms. Weekes and Mr. Savgur were given their current job titles in August 2009.

11.    Immediately prior to the Petition Date, for the year 2010, the CAO and CTO were compensated pursuant to their respective employment agreements with the Debtors, which were

K&E 17348722.7

approved by the Board and the Secured Financing Parties.  Under those employment contracts, annual compensation for the CAO and CTO was structured as: (a) an annual base salary, (b) an annual discretionary performance-based bonus of up to 20% of annual base salary, payable in December 2010, and (c) retention bonuses of up to 60% of annual base salary, payable on December 31, 2012, or upon termination without good cause or in the event of a change in control of the Debtors.  Additionally, employment agreements of each of the CAO and CTO provided for severance benefits in the amount of six months (i.e. 50%) of annual base salary.  The Debtors have not paid any cash bonus payments to the CAO and CTO during the postpetition period.

12.    As of the Petition Date, collectively, the Key Employees' employment agreements provided for a maximum total of $828,100 in cash bonuses for 2010.

**B.    Need for and Development of the Incentive Program.**

13.    The demands placed on the Key Employees in their capacities as employees of the Debtors have never been greater.  As a result of cost-cutting initiatives over the two years prior to the Petition Date, the Debtors' organization structure is quite lean, with little to no middle management.  As a result, the Debtors rely heavily on the Key Employees' knowledge, experience, and dedication.

14.    In addition to responsibility for the day-to-day management of the Debtors' business, the Key Employees have shouldered significant responsibilities stemming from the preparation and administration of the Debtors' chapter 11 cases and from litigation of the adversary proceedings. The Key Employees will continue to shoulder much responsibility for the duration of these chapter 11 cases.

15.    Moreover, prepetition and during the postpetition period, the Debtors and their counsel have been engaged in appeals (the "Appeals") of the San Diego County Assessor's assessments of an alleged possessory interest for the Debtors' possession and use of land and

improvements pursuant to a lease entered into by the Debtors and Caltrans (the "Property").  The Debtors' pursuit of the Appeals has required substantial and diligent efforts by the Key Employees over a period of two years, including substantial efforts during the Debtors' chapter 11 cases.  At a minimum, the property tax savings and refund achieved through the Tax Settlement surpassed the projected effect of a settlement of the Appeals provided in the 2010 budget (the "Budget"), which was approved by the Board and the Debtors' senior secured lenders (the "Secured Financing Parties"), by approximately $4.8 million.  In my opinion, the Tax Settlement would not have been possible without the efforts and commitment of the Key Employees.

16.    In addition to the Tax Settlement, the Debtors have achieved an increase in revenues and project completion savings since the filing of the Debtors' chapter 11 cases—both of which have required extensive efforts by the Key Employees during the course of the Debtors' chapter 11 cases.

17.    Both before the Petition Date and during the course of the Debtors' chapter 11 cases, the Key Employees have been incentivized to meet targets set forth in the Budget by the Debtors' past practice of providing cash bonuses for achievement of Budgeted EBITDA and other performance targets and by such bonuses and performance targets contained in the Key Employees' respective employment agreements with the Debtors.

18.    Nevertheless, while the Key Employees' have shouldered increasing responsibilities, they have seen their compensation suffer as a result of the Debtors' chapter 11 cases.  Further, the Key Employees have received no assurances regarding post-emergence compensation or employment.

19.    With the above considerations in mind, the Board directed the Debtors' financial advisor, Imperial Capital, LLC ("Imperial Capital"), to work with the Board, the Debtors, and the Debtors' restructuring counsel to assess the current compensation of the Key Employees.  Imperial Capital has provided the Board, the Debtors, and the Debtors' restructuring counsel with substantial

6

analysis regarding development and design of an incentive plan, alternative designs for incentivizing the Key Employees, the compensation practices of other chapter 11 debtors of similar size and other single toll road operators, and likely concerns of the Debtors' constituencies.

20.    After substantial additional review, analysis, and discussion, and after taking into consideration alternative designs and the likely concerns of the Debtors' constituencies, the disinterested members of the Board, Mark Wong, Peter Trent, and Christopher Leslie, found implementation of the proposed Incentive Program to be necessary and appropriate to compensate the Key Employees adequately for the discharge of very significant restructuring responsibilities they have assumed in addition to their day-to-day duties and to incentivize the Key Employees to continue devoting their energy, knowledge, expertise, and creativity to the Debtors' efforts to operate their business effectively and conclude these chapter 11 cases as expeditiously as possible. As a proposed participant in the Incentive Program, Mr. Hulsizer did not participate in the Board's vote approving the Incentive Program.

21.    The Board informed the Key Employees that the Debtors would seek approval of the Incentive Program by filing a motion with the United States Bankruptcy Court for the Southern District of California.    This information motivated the Key Employees to achieve Budgeted EBITDA and increase the value of the Debtors' estates.

22.    Upon obtaining Board approval of the Incentive Program, the Debtors and the Debtors' advisors consulted the Secured Financing Parties and the Secured Financing Parties' advisors as to the terms of the Incentive Program.    Upon information and belief, it is my understanding that the Secured Financing Parties have consented to implementation of the Incentive Program.

**II.    The Incentive Program.**

23.    The Debtors formulated the Incentive Program after considering the needs of their

business and after a comprehensive assessment of the Debtors' compensation practices and the compensation practices of other single toll road operators and debtors and after contemplating several alternative designs for incentivizing the Key Employees to stay focused on the tasks at hand.

### A.    Metric #1.

24.    As approved by the Board and the Secured Financing Parties, the Budgeted EBITDA established rigorous targets, which the Key Employees have worked and continue to work diligently to achieve.

25.    Specifically, the Budget provided for a 5.1% increase in tolling revenues, from $22.6 million actually achieved in 2009 to $23.7 million in revenues for the year ended December 31, 2010.  In addition, the Budget provided for an 8.5% increase in revenues after operating costs,[3] from $12.5 million actually achieved in 2009 to $13.6 million for 2010.  These targets represent challenging goals for the Key Employees to achieve, particularly in light of the prevailing economic condition of the areas surrounding the Expressway.  These revenue targets contemplate significant efforts by the Key Employees, including, but not limited to, working and coordinating with specialty consultants and original equipment vendors, to assess, repair, replace, and improve toll collection systems to meet contractual tolling requirements.

26.    The Budgeted EBITDA contemplates achievement of a reduction in property tax liability and a property tax refund in the amount of $273,000 on account of the Appeals.  Obtaining a reduction of the Debtors' historical property taxes required extensive efforts by the Key Employees to produce necessary documentation to and negotiate with the San Diego County Assessor.  Through the Tax Settlement, the Debtors obtained not only a reduction of property tax liability in excess of $8.3 million, but also achieved what I am informed will be one of the largest tax refunds ever obtained in San Diego County, increasing the value of the Debtors' estates by a minimum of

---

[3]    This figure excludes bonuses paid in 2009 and bonuses budgeted for 2010, as well as property taxes paid in 2009 and property taxes projected in 2010.

K&E 17348722.7

approximately $5.1 million in cash—an achievement of 1700% of the target approved by the Board and the Secured Financing Parties.

27.     The cash value of the Tax Settlement is included in the calculation of Actual EBITDA. As a result, the Key Employees will achieve the maximum cash awards under Metric #1.

**B.      Metric #2.**

28.     Currently, the Debtors are on schedule with respect to the projects required to be completed by December 31, 2010 pursuant to the project completion budget approved by the Board and the Secured Financing Parties in December 2009 ("Project Completion Budget"),[4] but to achieve Cost Savings and stay on schedule with respect to those projects, will require active management of contractor, insurer, and vendor relationships, and diligent attention to expenditures, including minimizing change orders and developing more efficient means of achieving project objectives.

**C.      Incentive Program Objectives.**

29.     Historically, and through the Incentive Program, the Debtors have chosen to compensate the Key Employees partly through performance-based cash bonus programs because doing so aligns the interests of the Key Employees with those of the Debtors' stakeholders.

30.     The Incentive Program is designed primarily to incentivize the Key Employees to achieve financial and restructuring objections that are important to the ongoing health of the Debtors' business and ensure that the Key Employees are fairly compensated for significant services during the Debtors' restructuring.

**III.    Conclusion.**

31.     I believe that payments under the Incentive Program are not only reasonable and appropriate, but also necessary, to properly compensate and incentivize the Key Employees and to ensure the Debtors' successful reorganization.

---

[4]    The Project Completion Budget was approved by the Board and agreed upon by the Debtors and the Secured Financing Parties as part of that certain Standstill Agreement, dated as of December 15, 2009.

32.     I believe that the benefits of the Key Employees' efforts in achieving the target metrics under the Incentive Program metrics will far exceed the maximum cost of the cash awards.

33.     I believe that implementation of the Incentive Program is a reasonable exercise of the Debtors' sound business judgment, is in the best interests of their estates and the stakeholders in these chapter 11 cases, and is justified by the facts and circumstances.

34.     Accordingly, on behalf of the Debtors, I respectfully submit that the Incentive Plan should be approved.

*[Remainder of Page Intentionally Left Blank]*

10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  August 23, 2010
San Diego, California

Respectfully submitted,

*/s/ Anthony G. Evans*
Anthony G. Evans
Chief Financial Officer

K&E 17348722.7

**<u>EXHIBIT C</u>**

1  R. Alexander Pilmer (CA 166196)
   **KIRKLAND & ELLIS LLP**
2  333 South Hope Street
   Los Angeles, California  90071
3  Telephone:     (213) 680-8400
4  Facsimile:     (213) 680-8500

5  James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
   Marc Kieselstein, P.C. (admitted *pro hac vice*)
6  Chad J. Husnick (admitted *pro hac vice*)
   Meredith L. Shafe (admitted *pro hac vice*)
7  **KIRKLAND & ELLIS LLP**
8  300 North LaSalle Street
   Chicago, Illinois  60654
9  Telephone:     (312) 862-2000
   Facsimile:     (312) 862-2200
10

11 Attorneys for the Debtors
   and Debtors in Possession

12
                **UNITED STATES BANKRUPTCY COURT**
13              **SOUTHERN DISTRICT OF CALIFORNIA**

14 | In re: | Chapter 11 |
15 | | Case No. 10-04516-LA11 |
   | SOUTH BAY EXPRESSWAY, L.P. and | |
16 | CALIFORNIA TRANSPORTATION | (Joint Administration Requested with |
   | VENTURES, INC.,[1] | Case No. 10-04518) |
17 | | |
   | Debtors. | **DECLARATION OF ROBERT** |
18 | | **WARSHAUER IN SUPPORT OF THE** |
   | | **MOTION OF THE DEBTORS FOR ENTRY** |
19 | | **OF AN ORDER AUTHORIZING THE** |
   | | **IMPLEMENTATION OF KEY EMPLOYEE** |
20 | | **INCENTIVE PROGRAM** |
21

22

23

24

25

26 _____
   [1]  Pursuant to section 342(c)(1) of title 11 of the United States Code, the last four digits of each debtor's federal tax
27     identification number are:  South Bay Expressway, L.P. (9083) and California Transportation Ventures, Inc. (5119).
       The location of the debtors' corporate headquarters and the debtors' service address is:  1129 La Media Road, San
28     Diego, California  91914.

I, ROBERT WARSHAUER, declare and state as follows:

1.    I serve as Managing Director, Co-Head of the Restructuring Advisory Practice, and Head of the New York Investment Banking Group for Imperial Capital, LLC ("Imperial Capital"), which has its principal office in Los Angeles, California.  I am hereby authorized to execute this declaration on behalf of Imperial Capital.

2.    Imperial Capital serves as Financial Advisors to South Bay Expressway, L.P., a California Limited Partnership and California Transportation Ventures, Inc. (together, the "Debtors").

3.    Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents and information supplied to me by members of the Debtors' management and the Debtors' advisors.  I am authorized to submit this declaration in support of the *Motion of the Debtors for Entry of an Order Authorizing the Implementation of Key Employee Incentive Program* (the "Motion").[2]  I am authorized to submit this declaration on behalf of the Debtors and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.  I submit this declaration under penalty of perjury pursuant to 28 U.S.C. § 1746.

**I.    Overview.**

4.    The Incentive Program is purely incentive-based because maximizing the value of the Debtors' estates is the sole determinant as to whether the Key Employees earn incentive payments under the plan.  For example, for the Key Employees to earn an incentive payment related to financial performance, the company must achieve, at a minimum, the threshold level of its targeted 2010 EBITDA.  Additionally, to earn an incentive payment related to the capital expenditures included in the project completion budget approved by the Debtors' board of directors (the "Board")

---

[2]    All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

and senior secured lenders (the "<u>Secured Financing Parties</u>"), the cost to complete the Projects must be less than the amount budgeted.  Finally, the company must emerge from bankruptcy protection within 180 days of the entry of an order by the United States Bankruptcy Court for the Southern District of California determining the lien priority dispute between the Debtors, Otay River Constructors, InTranS Group, Inc., and the Debtors' prepetition secured lenders for the balance of the Incentive Program awards to be paid.  Thus, the Incentive Program is designed to motivate the Key Employees to perform at optimal financial levels and also align with critical non-financial goals, thus preserving and maximizing the value of the Debtors' estates for all parties in interest.

5.     Under no circumstance would the Incentive Program provide a payment solely for the employee's continued service.  Moreover, in my opinion, the metrics by which cash bonuses are determined are challenging.

**II.     Background and Qualifications.**

6.     I earned a Bachelor's of Science in Business Administration from Bucknell University in 1980 and a Masters of Business Administration from New York University in 1985.  I joined Imperial Capital in 2008.  Prior to joining Imperial Capital, I was a Managing Director at Kroll Zolfo Cooper, where I primarily focused on the firm's restructuring practice.   Previously, I was a Managing Director and member of the Board of Directors of Giuliani Capital Advisors LLC, and its predecessor firm, Ernst & Young Corporate Finance LLC, where I specialized in corporate restructuring and mergers and acquisitions.  As part of my banking and restructuring experience, I have served as CEO and President of an international business services and manufacturing company responsible for over 2,500 employees in 16 countries and was President and a member of the Board of Directors of a publicly traded technology company.

7.     Imperial Capital is a national financial services firm, with broad activities covering trading in equities, convertible securities, and corporate bonds, as well as national corporate finance

3

and restructuring practice.  Imperial Capital has extensive experience and an excellent reputation for providing high quality financial advisory services to debtors, creditors, and other parties in interest in bankruptcy reorganizations and other restructurings.  The other Managing Director involved in advising the Debtors, Marc Bilbao, and I each have over 20 years of restructuring advisory experience.  In the numerous chapter 11 cases in which we have been involved, management incentive compensation plans have played an integral role.

**III.    The Debtors' Key Employee Incentive Program.**

8.    The Incentive Program provides benefits to four key employees identified by the Debtors as critical to the business' financial and operational success during the anticipated chapter 11 period:   (a) Greg Hulsizer, the Debtors' Chief Executive Officer (the "CEO"); (b) Anthony Evans, the Debtors' Chief Financial Officer (the "CFO"); (c) Theresa Weekes, the Debtors' Chief Accounting Officer ("CAO"); (d) Shane Savgur, the Debtors' Chief Technology Officer ("CTO") (collectively, the "Key Employees").

9.    The Incentive Program is comprised of three separate metrics:

- Metric #1:  the Debtors' actual 2010 EBITDA compared to the Debtors' budgeted 2010 EBITDA;

- Metric #2:   actual project completion timing and costs compared to the project completion budget approved by the Board and Secured Financing Parties; and

- Metric #3: the timing of the Debtors' emergence from bankruptcy protection.

Under the Incentive Program, the CEO and CFO have the opportunity to earn cash bonus payments under Metrics #1, #2, and #3.  The CAO and CTO have the opportunity to earn cash bonus payments only under Metric #1.

10.    Metric #1 is based on the 2010 operating budget approved by the Board and the Secured Financing Parties in January 2010.

11.    Metric #2 is based on the project completion budget approved by the Board and the

4

Secured Financing Parties in December 2009 and the specific terms of the Incentive Program.

12.    In developing the Incentive Program, Imperial Capital reviewed the Debtors' historical project completion schedules and analyzed closely the Projects included in the Project Completion Budget.

13.    In the event the Debtors emerge from chapter 11 protection before year-end, bonus amounts earned under the Incentive Program will be calculated on a prorated basis.

14.    The Debtors' total obligations under the Incentive Program will vary based on the performance of the Debtors. The maximum potential cost of the Incentive Program, assuming each Key Employee achieves his or her maximum allowable bonus under the Incentive Program, is approximately $681,800, which is less than 0.1% of the Debtors' $570 million of total liabilities as of the Petition Date.[3]

15.    For each of the three metrics, if the Debtors' performance on these metrics does not meet certain minimum thresholds, no Key Employee will receive a cash bonus. At the same time, regardless of how well the Debtors perform on each of these metrics, total cash awards to any Key Employee under the Incentive Program are capped at 100% of base salary.

IV.    **Imperial Capital's Independent Review Of The Reasonableness Of The Incentive Program.**

16.    In connection with its role as Financial Advisors to the Debtors, Imperial Capital was directed by the Board to work with the Board, the Debtors, and the Debtors' restructuring counsel to design an Incentive Program that is consistent with market practices and that addresses the need of the Debtors to motivate its Key Employees. Imperial Capital reviewed the Debtors' existing base salary, annual, and long-term incentive compensation practices with respect to the Key Employees. Imperial Capital also discussed performance metrics and target levels historically utilized with

---

[3]    This amount does not include claims asserted by Otay River Constructors in connection with the lien priority litigation.

respect to the Key Employees. Through this review, Imperial Capital was able to fully understand the Debtors' recent compensation history and structure the Incentive Program with appropriate consideration for the specific and reasonable objectives of the Debtors in this instance.

17.    In assessing the reasonableness of the Incentive Program, Imperial Capital conducted a market analysis for the management positions of the Debtors covered under the Incentive Program, including benchmarking against the compensation and incentive programs provided by comparable employers and similarly-sized chapter 11 debtors.

18.    Imperial Capital analyzed the historical compensation data of publicly-traded toll road operators, with a focus on single asset companies. *See* **Exhibit 1** attached hereto and incorporated by reference. The limited universe of single asset toll road operators with publicly disclosed compensation data, combined with the variability of compensation for key employees during the different stages in the lifecycle of a toll road, limited the usefulness of this analysis in our determination of appropriate compensation levels. Moreover, data regarding employees beyond the two executives (CEO and CFO) was not available. While the data gathered supports the structure and compensation levels in the Incentive Program, Imperial Capital relied more heavily on its comprehensive analysis of incentive programs in other recent chapter 11 cases involving companies of similar size to the Debtors.

19.    Imperial Capital conducted a comprehensive review of incentive programs approved in recent chapter 11 proceedings. The universe of comparable incentive programs included all key employee incentive programs approved in cases filed since January 1, 2009 in all jurisdictions in the United States. Recognizing that the size of a debtors' balance sheet can affect the compensation of key employees, Imperial Capital segmented the data to include only cases with liabilities at the petition date of between $300 million and $1.0 billion. *See* **Exhibit 2** attached hereto and incorporated by reference. While each incentive program is specifically tailored with metrics

relevant to each debtor and industry in which it operates, the types of bonus structures can generally be fit into three categories.  Bonus payments are generally based on a combination of the following: (i) operating performance, as measured by cash flow or liquidity/availability, (ii) cost savings, either operations- or project-related, and (iii) milestones, primarily restructuring or sale process related.  In evaluating and analyzing the market data, the split of total compensation between base salary and bonus payments can vary greatly, making it important to not only analyze the dollar amount of potential bonus payments under the incentive program, but also the amount of the base salary, the potential bonus payments as a percentage of base salary and total potential compensation.  Imperial Capital analyzed both the structure and the compensation levels of each comparable incentive program to creating an appropriate incentive construct for the Debtors.

20.    Once the relevant market data was gathered from the publicly-traded single asset toll road operators and the recent chapter 11 incentive programs, specific information regarding the four Key Employees was used to develop target Incentive Program opportunity levels.  The market data was considered alongside the Debtors' historical compensation structure, the most recent pre-petition employment agreements for each of the Key Employees and the roles of the individual Key Employees in the Debtors' operations and restructuring efforts.

## V.    Result of Imperial Capital's Independent Review.

21.    Based upon my analysis of the Incentive Program, it is my belief that the structure of the Incentive Program, as it currently stands, is consistent with typical market practice and properly aligns management's incentives with the Debtors' operating success.

22.    The Incentive Program will enable the Key Employees to receive compensation that is consistent with market.  Even if the Key Employees receive the maximum cash bonuses available under the Incentive Program, their total compensation will be roughly equivalent to or less than that of comparable senior management at other publicly-traded single asset toll road operators and will

be at the low end of that paid by chapter 11 debtors with similar debt loads.

23.    It is common practice to implement an Incentive Program for employees that are critical to a debtor's restructuring efforts.  The structure of the plans in recent cases varies based on the unique circumstances of each case, but the general terms and conditions are consistent with the Debtors' proposed Incentive Program.

24.    The analysis performed by Imperial Capital supports the Debtors' conclusion that payments under the Incentive Program are not only reasonable and appropriate, but also necessary, to properly compensate and incentivize the Key Employees and to ensure the Debtors' successful reorganization.

**VI.    Conclusion: The Debtors' Incentive Program Is Reasonable And Justified By Market Practices.**

25.    Based on my education, experience, and the work I have done in this case, it is my opinion that the Debtors' Incentive Program is designed consistent with typical market practice, is fair and reasonable given the facts and circumstances, provides anticipated value that is appropriate to competitively motivate talented staff and is required to maximize the value of the Debtors' estates for all parties in interest.

1

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

2

correct.

3

Dated:  August 23, 2010

Respectfully submitted,

4

San Diego, California

5

_/s/ Robert Warshauer_

Robert Warshauer

6

Managing Director

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9

**<u>EXHIBIT 1</u>**

## Summary of Recent Key Employee Incentive Plans for Key Executives[1]

*(as of July 9, 2010)*

| | Base Salary | Performance Bonus | | Project / Cost Savings Bonus | | Milestone Bonus | | Total Bonus | | Total Compensation |
|---|---|---|---|---|---|---|---|---|---|---|
| | | $ | % of Base | $ | % of Base | $ | % of Base | $ | % of Base | |
| **Recent KEIP Plans** | | | | | | | | | | |
| Average CEO [2] | $448,329 | $263,699 | 58.8% | $52,000 | 11.6% | $269,517 | 60.1% | $426,799 | 95.2% | $926,262 |
| Average CFO [3] | $277,731 | $110,029 | 39.6% | $38,400 | 13.8% | $143,558 | 51.7% | $199,181 | 71.7% | $496,795 |
| **Incentive Program (Maximum Compensation per Metric)** | | | | | | | | | | |
| CEO | $275,000 | $206,250 | 75.0% | TBD | N/A | $137,500 | 50.0% | $275,000 | 100.0% | $550,000 |
| CFO | $240,000 | $180,000 | 75.0% | TBD | N/A | $120,000 | 50.0% | $240,000 | 100.0% | $480,000 |

Note:  All numbers shown represent maximum payouts.

(1) Includes all U.S. bankruptcy filings with liabilities at the petition date of between $300 million to $1 billion filed from January 1, 2009 to the date of this analysis (excluding KEIP motions with insufficient data for comparison of individual employees).

(2) CEO data includes the lead operational executive in each case.

(3) CFO data includes the lead financial executive in each case.

**<u>EXHIBIT 2</u>**

## Summary of Comparable Toll Road Operator Executive Compensation

*(as of July 9, 2010)*

| | Base Salary | Performance Bonus | | Milestone Bonus | | Total Bonus | | Total Compensation |
|---|---|---|---|---|---|---|---|---|
| | | $ | % of Base | $ | % of Base | $ | % of Base | |
| *Publicly-traded single asset toll road operators* | | | | | | | | |
| Average CEO | $340,361 | $131,408 | 34.3% | $729,344 | $160.4% | $313,744 | 74.4% | $654,105 |
| Average CFO | $273,666 | $105,954 | 32.1% | $344,064 | $104.6% | $191,970 | 58.2% | $465,636 |
| *Incentive Program* | | | | | | | | |
| CEO | $275,000 | $206,250 | 75.0% | $137,500 | 50.0% | $275,000 | 100.0% | $550,000 |
| CFO | $240,000 | $180,000 | 75.0% | $120,00 | 50.0% | $240,000 | 100.0% | $480,000 |

Note:  Incentive Program numbers shown represent maximum payouts per metric.

**<u>EXHIBIT D</u>**

# SOUTH BAY EXPRESSWAY, L.P.

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") is entered into to be effective on January 1, 2010 by and between South Bay Expressway, L.P., a California limited partnership (the "Company"), and Greg Hulsizer ("Hulsizer") with reference to the following recited facts:

## RECITALS

A.      Hulsizer is currently employed by the Company as its Chief Executive Officer (serving concurrently as the Chief Executive Officer of California Transportation Ventures, Inc. ("CTV"), the general partner of the Company).

B.      The Board of Directors of CTV ("Board") has determined that it is in the best interests of the Company and CTV to secure continuity in its executive management, and to also establish a working environment for its executive management that minimizes the distractions that may result from possible changes or reorganizations in which the Company might be involved.

C.      The Company has offered to continue the employment of Hulsizer as its Chief Executive Officer for a specific term and Hulsizer has accepted such employment pursuant to the terms of this Agreement.

D.      Hulsizer's current employment is pursuant to that certain letter agreement dated August 26, 2003 executed by Nicholas James on behalf of CTV and the Company, and by Hulsizer.  The parties intend that this Agreement shall replace and supersede such letter agreement in its entirely.

NOW, THEREFORE, incorporating the above recitals, which are material elements of this Agreement, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and Hulsizer agree as follows:

## AGREEMENT

1.      <u>Employment Term</u>.    The term of employment and this Agreement shall commence on January 1, 2010 and continue for a period of one (1) year ("Term"), unless earlier terminated in accordance with Section 7 of this Agreement.

1.1      *Renewal of Agreement.*  The Company shall notify Hulsizer in writing on or before June 30, 2010 whether it will renew or not renew the Term beyond its initial period. In the event that the Company notifies Hulsizer that it will renew the Term, Hulsizer will notify Company within five (5) business days if he wishes to renew the Term. In the event the Company notifies Hulsizer that it will not renew the Term, Hulsizer agrees to continue his employment with the Company through December 31, 2010, subject to the terms and conditions



of this Agreement, including the provisions for early termination of the Term. In the event the Company fails to notify Hulsizer whether it will renew or not renew the Term beyond its initial period, such failure shall be deemed as the Company electing not to renew the Term.

2.    <u>Replacement of Prior Employment Agreement</u>.    That certain letter agreement dated August 26, 2003 executed by Nicholas James on behalf of CTV and the Company, and by Hulsizer on is hereby rescinded in its entirety and replaced and superseded by this Agreement.

3.    <u>Title</u>. Hulsizer's title shall be Chief Executive Officer. He shall serve in that capacity for the Company and for CTV.

4.    <u>Duties</u>.

4.1    *Continuation of Previous Duties*. Hulsizer shall continue to have all of the authority, duties and responsibilities that he previously had in his employment with Company with respect to the overall leadership and management of the Company, including profit and loss and organizational management, strategic planning/implementation, construction, legal/litigation and investor, lender, stakeholder and public relations, and such other duties commensurate with his position as may be assigned to him from time to time by the Board.

4.2    *Reporting*. Hulsizer shall report to and be accountable to the Board. Hulsizer will observe and comply with Company's rules, regulations and policies in the performance of his duties to the extent they are not inconsistent with this Agreement and carry out and perform orders, directions and policies as may be prescribed by the Board from time to time.

4.3    *Time and Attention*. Hulsizer agrees, to the best of his ability and experience, to loyally and conscientiously perform all of the duties and obligations required by the terms of this Agreement. Hulsizer shall be an exempt employee (under California labor law) and devote substantially all of his business time and attention to the Company throughout the Term. Notwithstanding anything to the contrary herein, Hulsizer may devote reasonable amounts of time to personal, charitable and professional activities so long as such activities, do not materially interfere with Hulsizer's duties hereunder.

5.    <u>Compensation</u>.

5.1    *Base Salary*. During the Term the Company shall compensate Hulsizer at an annual salary of Two Hundred Seventy Five Thousand Dollars ($275,000) ("Base Salary"), payable bi-weekly in accordance with the Company's payroll practices.

5.2    *Performance Bonus*. Hulsizer shall be paid a quarterly performance bonus based on his performance; subject to Board approval. An amount equal to 50% of Hulsizer's base salary ($137,500) shall be included in the 2010 budget and be available for payment of such performance bonus. Hulsizer shall report on progress toward financial and other goals and objectives established by the Board as part of monthly Board materials. In reviewing Hulsizer's performance and performance bonus, the Board shall take into account Hulsizer's work efforts



and results in implementing Board directives, SBX financial performance relative to budget and Hulsizer's achievement of KPIs and performance objectives. The Board shall consider Hulsizer's performance and as it deems appropriate, award Hulsizer a Performance Bonus quarterly, according to the following schedule, criteria and targets amounts:

| Bonus Date | Criteria | Target Bonus |
|---|---|---|
| March 15, 2010 | Budgeted EBITDA and KPI/Work Program achievement | $43,375 |
| June 15, 2010 | Budgeted EBITDA and KPI/Work Program achievement | $43,375 |
| September 15, 2010 | Budgeted EBITDA and KPI/Work Program achievement | $43,375 |
| December 15, 2010 | Budgeted EBITDA and KPI/Work Program achievement | $43,375 |

It is understood that achievement of budgeted EBITDA and certain KPI and/or Work Program items are subject to influence by factors outside Hulsizer's control (e.g. local economic impacts impacting traffic and revenue, items requiring lender approval, which may or may not be granted, etc.) and it is agreed that such factors beyond Hulsizer's control shall be taken into consideration by the Board in considering award of any Performance Bonus to Hulsizer under this Agreement.

     5.3    *First Retention Incentive.*  On June 30, 2010, or concurrent with the first bi-weekly payroll thereafter, the Company shall pay Hulsizer a first retention incentive equal to fifty percent (50%) of his Base Salary (i.e., $137,500, ("First Retention Incentive") if Hulsizer has been employed by the Company (or any of its affiliates) for any length of time between January 1, 2010 and June 30, 2010.

     5.4    *Second Retention Incentive.*  On December 31, 2010, the Company shall pay Hulsizer a second retention incentive equal to fifty percent (50%) of his Base Salary (i.e., $137,500, ("Second Retention Incentive") if (i) Hulsizer has been employed by the Company (or any of its affiliates) for any length of time between January 1, 2010 and December 31, 2010; and (ii) on or before June 30, 2010, the Company has notified Hulsizer that it will not renew the Term beyond its initial period (or failed to give written notification, as the case may be); or the Company has notified Hulsizer on or before June 30, 2010, that it will renew the Term but the Company and Hulsizer have not executed a new employment agreement or renewal and extension of this Agreement on or before July 31, 2010.

     5.5    *Housing Allowance.*  The Company shall pay Hulsizer a housing allowance in the amount of $20,000 per year to maintain a residence near the Company's office. Such allowance shall be payable in bi-weekly installments of $769.24 concurrent with payment of the Base Salary.

     5.6    All compensation shall be less amounts required to be withheld under applicable law and voluntary amounts requested to be withheld by Hulsizer.



6.    <u>Benefits</u>.  Hulsizer shall be entitled to the following benefits in addition to such other benefits as are generally provided to other employees of the Company in upper management positions:

A.    *Vehicle.*  The Company shall lease or purchase for Hulsizer's use a new vehicle, of the type agreeable to Hulsizer, for use in commuting, performing his duties for the Company, and personal use.  The Company will replace the vehicle with a new vehicle every 100,000 odometer miles and pay for all insurance, repairs, maintenance and other expenses for the vehicle, other than gasoline.

B.    *Professional Development.*  The Company shall pay the reasonable fees and expenses for Hulsizer's participation and membership in professional and business organizations and associations (including membership and expenses associated with Hulsizer's membership in Vistage International), continuing education and development; participation in professional and business activities; subscriptions to business periodicals and literature; marketing and professional development; and other expenses incurred in advancing the Company's interests or maintaining and enhancing Hulsizer's professional competency and standing for the benefit of the Company.  In addition, the Company shall pay for Hulsizer's reasonable travel, transportation, lodging and meal expenses for his participation in short courses, institutes, seminars, meetings and events that are in pursuit of the Company's business and to continue Hulsizer's professional development.

C.    *Business Expenses.*  The Company shall directly pay or reimburse Hulsizer for his business expenses incurred in performing his duties under this Agreement which may include, but are not limited to, parking, meals, travel and transportation expenses, lodging and other reasonable and necessary business related expenses.  Hulsizer shall provide documentation for all such expenses in accordance with the Company's policies.  Reimbursement of all expenses incurred by Hulsizer, as described in herein, shall be limited to those expenses typically tax-deductible as a company's business expenses under the rules and regulations of the Internal Revenue Code.

D.    *Group Insurance.*  Hulsizer (and his dependents, as applicable) shall be entitled to all dental, health, disability, life insurance benefits and other similar plans pursuant to and in accordance with the terms and conditions of the Company's employee group policies and plans.  The proceeds of insurance, if any, that Hulsizer may receive shall belong to Hulsizer.

E.    *Retirement/Pension Plans.*  Hulsizer shall be vested and entitled to participate in the Company's 401k, retirement and/or pension plans, and such other similar plans as may be established by the Company under the same terms, conditions and benefits as for other management level employees of the Company.

F.    *Vacation and Holidays.*  Hulsizer shall be entitled to twenty (20) days of paid vacation leave during the Term in addition to his current balance of 40 days of previously accrued vacation.  Hulsizer shall not be subject to any limits on the number of days of



paid vacation that may accrue. All unused vacation remaining at the end of the Term shall be paid to Hulsizer. Hulsizer shall also be entitled to the same paid holidays given by the Company to other management level employees.

        G.    *Sick Leave.*    Hulsizer shall be entitled to paid sick leave in accordance with the Company's employee policies.

        H.    *Company Insurance.*    The Company, at its expense, shall cover Hulsizer as an insured under the Company's standard directors and officers insurance policy insuring Hulsizer against liability arising out of the performance of his duties, and shall indemnify and hold Hulsizer harmless from liability arising out of his services hereunder to the fullest extent allowed under law, including but not limited to advancement of legal fees. The provisions of this subsection shall survive the termination of the Term.

        I.    *Other Benefits.*    The Company shall make available to Hulsizer any and all other employee or fringe benefits (in accordance with their terms and conditions) which Company may generally make available to its other management level employees.

    7.    <u>Termination</u>.    The Term shall end and Hulsizer's employment with Company shall terminate upon the happening of any one of the following events:

        A.    The Term expires.

        B.    Hulsizer becomes disabled.    For purposes of this Agreement, "disabled" means the same as in any applicable disability insurance policy covering Hulsizer, or in the absence thereof, that Hulsizer is incapable of performing his normal duties under this Agreement, with or without reasonable accommodation, because of a physical or mental incapacity that has prevented Hulsizer from performing his duties for a period of ninety (90) consecutive calendar days and it is reasonably determined that such incapacity is likely to continue for at least another ninety (90) days. Such determination shall be determined in good faith by the Board in consultation with Hulsizer's treating physician(s). Termination under this subsection 7.B shall be effective on the date of the determination that Hulsizer's incapacity is likely to continue for at least another ninety (90) days.

        C.    The death of Hulsizer.

        D.    The Company terminates Hulsizer's employment for Good Cause (as such term is defined herein) by written notice to Hulsizer specifying in reasonable detail the particular factors forming the basis for such Good Cause;

        F.    The Company terminates Hulsizer's employment without Good Cause by written notice to Hulsizer.

        G.    Hulsizer voluntarily resigns his employment for other than Good Reason (as such term is defined herein) by written notice to the Board.



H.    Hulsizer resigns his employment for Good Reason by written notice to the Board specifying in reasonable detail the particular factors forming the basis for such Good Reason.  Good Reason shall include a Change of Control (as such term is defined herein).

7.1    <u>Termination Date</u>.  The "Termination Date" is the date as of which Hulsizer's employment with the Company terminates for any reason.  Any notice of termination given pursuant to the provisions of this Agreement shall specify the Termination Date.

7.2    <u>Definitions</u>.  For purposes of this Agreement, the following terms shall have the following meanings:

A.    "Good Cause" means and shall exist if, and only if:

(i)  Hulsizer willfully and repeatedly fails or refuses to attempt in good faith to perform his obligations under this Agreement in any material respect, provided that Good Cause shall not exist unless Company has first provided Hulsizer with written notice specifying in reasonable detail the particular factors forming the basis for such failure or refusal and such failure or refusal shall not have been cured by Hulsizer within thirty (30) days after such notice or, if impracticable of being cured within such thirty (30) day period, such longer period as may reasonably be necessary to accomplish the cure;

(ii)  Hulsizer has been convicted of a crime which constitutes a felony under applicable law or has entered a plea of guilty or nolo contendere with respect thereto; or

(iii)  Hulsizer engages in willful misconduct that is materially detrimental to the reputation, character or standing of the Company, provided that no act shall be deemed detrimental if done in good faith that such act is not adverse to the best interests of the Company.

B.    "Good Reason" as used in this Agreement involves circumstances that support a determination that Hulsizer's resignation is the functional equivalent of an involuntary termination, and shall exist upon the occurrence of any of the following:

(i)    a material diminution in Hulsizer's responsibilities, compensation and/or benefits described Sections 5 and 6 of this Agreement;

(ii)  an assignment to Hulsizer or change of any duties inconsistent in any material respect with Hulsizer's position (including status, office, titles and reporting relationships), authority, duties or responsibilities, or any other action or actions by Company which when taken as a whole results in a material diminution in Hulsizer's position, authority, duties or responsibilities.  Excluded for this purpose shall be any isolated, immaterial and inadvertent action not taken in bad faith and which is remedied by Company immediately after receipt of notice thereof given by Hulsizer;



(iii)   a material diminution in the budget over which Hulsizer retains authority;

(iv)  any change requiring Hulsizer to report to a corporate officer or employee instead of directly to the Board;

(v)  a relocation of the Company's business office where Hulsizer performs a substantial part of his duties to a location more than fifty (50) miles from its location as of the date of this Agreement (unless such relocation is recommended by Hulsizer, consented to by Hulsizer or closer to Hulsizer's primary residence), or the Company requires Hulsizer to be based at any location other than within fifty (50) miles of the Company's current office location (except for requirements of temporary travel on the Company's business to an extent substantially consistent with the Hulsizer's business travel obligations existing immediately prior to the date of this Agreement);

(vi)  a Change in Control of the Company as defined below;

(vii)   the Company requests, through any person or group of persons superior in authority to Hulsizer, that with respect to the performance of his duties, he commit an act or omit to do an act that Hulsizer believes to be illegal after first consulting with independent legal counsel knowledgeable on the subject matter of the act or omission;

(viii)   any member of the Board requests in writing to Hulsizer that Hulsizer resign his employment; or

(ix)  the Company is a debtor under title 11 of the United States Code ("Bankruptcy Code") and an Order approving the assumption of this Agreement under Section 365 of the Bankruptcy Code has not been entered on the docket of the Bankruptcy Court by no later than the 45th day after the entry of the order for relief

(x)  any other action or inaction by the Company that constitutes a material breach of one or more terms of this Agreement.

In all cases, Good Reason for Hulsizer to resign his employment shall not exist unless: (i) Hulsizer has first provided the Board with written notice specifying in reasonable detail the particular factors forming the basis for such Good Reason.  Such notice must be given by Hulsizer within ninety (90) days of the initial existence of a condition of Good Reason and the Company shall have a period of thirty (30) days from receipt of such notice to cure such condition; and (ii) Hulsizer actually resigns and terminates his employment within a period of time not exceeding six (6) months following knowledge by Hulsizer of the existence of a condition of Good Reason for his resignation.  Failure by Hulsizer to resign within such period will be deemed his acceptance of the circumstances that may have given rise to the existence of Good Reason.

C.     "Change in Control" means: (i) any person or entity other than the existing owners becomes the beneficial owner of CTV or the Company or a substantial part of



SBX's assets; (ii) approval has been given for a consolidation, recombination or merger of the Company in which the Company is not the continuing or surviving entity; or (iii) there is a sale, lease, exchange, foreclosure, repossession or other transfer of all or substantially all of the assets of the Company in one related transaction. In all cases, a Change in Control shall not occur if Hulsizer has been offered and accepted or offered and rejected employment by any entity that substantially succeeds to the Company's interests which employment is substantially the same as his employment with the Company in terms of compensation, status, title, duties and responsibilities and the Company or the new owner are not in breach of this Agreement.

    8.    <u>Termination Compensation Upon Expiration of the Term, Voluntary Resignation, Termination for Good Cause, or Disability.</u>

    8.1    *Upon Expiration of the Term.* Upon expiration of the Term, the Company shall pay Hulsizer his earned but unpaid compensation (including, without limitation, the compensation otherwise due and payable pursuant to Section 5 (ie. Base Salary, Performance Bonus, First Retention Incentive and Second Retention Incentive) of this Agreement, Hulsizer's accrued and unused vacation leave, and all other amounts which constitute wages under California law), due and unpaid housing allowance, unpaid reimbursements and other unpaid expenses due or accrued as of the date of the end of the Term (and as determined consistently with Treasury Regulation Section 1.409A-1(h)(1)(ii)). Payment of such amounts shall be made at the time and in the manner prescribed by California law applicable to the payment of wages. In addition, at Hulsizer's expense, the Company shall provide continuity of only those benefits as described in Section 6, which by law must be continued after termination of employment. The time and manner of payment or other delivery of such continued benefits and the recipients of such benefits shall be determined according to the terms and conditions of the applicable plans and programs. The payments and benefits as described in Section 5 and this Section 8.1 shall be referred to in this Agreement as the "Standard Termination Entitlements."

    8.2    *Upon Hulsizer's Voluntary Resignation of Employment.* In the event of Hulsizer's voluntary resignation of his employment for other than Good Reason, the Company shall pay Hulsizer only the Standard Termination Entitlements which have become due or are accrued through the date of such resignation. Payment of monetary amounts shall be made at the time and in the manner prescribed by California law applicable to the payment of wages.

    8.3    *Upon Termination For Good Cause.* In the event the Company terminates Hulsizer's employment for Good Cause, the Company shall pay Hulsizer only the Standard Termination Entitlements which have become due or are accrued through the date of such termination. Payment of monetary amounts shall be made at the time and in the manner prescribed by California law applicable to the payment of wages.

    8.4    *Upon Hulsizer's Work-Related Disability.* If Hulsizer becomes disabled (as that term is defined in Section 7.B) while employed by the Company and such disability is directly related Hulsizer's performance of his duties, the Company shall pay to Hulsizer (or his legal personal representative entitled thereto, if applicable), the Standard Termination Entitlements which have become due or are accrued through the date of termination on account of disability, and so much of the First Retention Bonus and Second Retention Bonus as would



otherwise be payable to Hulsizer under the terms of this Agreement, prorated based on the number of full months Hulsizer worked from January 1, 2010 to the date of termination of his employment on account of such disability.

      8.5    *Upon Hulsizer's Non Work-Related Disability.*  If Hulsizer becomes disabled (as that term is defined in Section 7.B) while employed by the Company, and such disability is not directly related to Hulsizer's performance of his duties, the Company shall pay to Hulsizer (or his legal personal representative entitled thereto, if applicable), the Standard Termination Entitlements which have become due or are accrued through the date of termination on account of disability.

      8.6    *Full Compensation.*  The compensation described above in this Section 8 shall be the full and only compensation payable by the Company to Hulsizer and Hulsizer shall not be entitled to any other payments of any type including, without limitation, the right to receive any continuation of benefits unless otherwise provided by this Agreement or by law.

    9.    <u>Termination Compensation Upon Hulsizer's Death</u>.  If Hulsizer dies while employed by the Company, upon his death, the Company shall pay to Hulsizer's estate (or such other person who shall be legally entitled thereto):

      (i) the Standard Termination Entitlements which have become due or are accrued through the date of death; and

      (ii) any amount of the First Retention Incentive and the Second Retention Incentive not already paid to Hulsizer, notwithstanding the fact that, on account of his death, Hulsizer was not employed by the Company at the time such payments were otherwise payable.

      9.1    *Benefits to Dependents.*  In addition to the foregoing, the Company shall provide the benefits, if any, due to Hulsizer's estate, surviving dependents or his designated beneficiaries under the employee benefit plans and programs provided for employees of the Company in which Hulsizer participated. The amount, time and manner of payment or other delivery of such benefits and the recipients of such benefits shall be determined according to the terms and conditions of the applicable plans and programs.

    10.    <u>Termination Compensation Upon Resignation For Good Reason or Termination Without Good Cause</u>. In the event Hulsizer resigns his employment for Good Reason or the Company terminates Hulsizer's employment without Good Cause, upon such resignation or termination, the Company shall pay or provide to Hulsizer the Standard Termination Entitlements which have become due or are accrued through the date of such resignation or termination. Payment of monetary amounts shall be made at the time and in the manner prescribed by California law applicable to the payment of wages. In addition, the Company shall, subject to Hulsizer's execution, within thirty (30) days, of a general release of claims in a form reasonably satisfactory to the Company:

      (i) provide, at the Company's expense, continued dental, health, disability and life insurance coverages and benefits pursuant to and in accordance with the terms and



conditions of the Company's employee group policies and plans for Hulsizer (and his dependents, as applicable), until the date Hulsizer first becomes eligible for such coverages and benefits under the policies or plans maintained by a subsequent employer or December 31, 2010, whichever is earlier;

               (ii) pay an amount equal to the total amount of the Base Salary, budgeted Performance Bonus referenced in Section 5.2 of this Agreement, accrued vacation, First Retention Incentive, Second Retention Incentive, housing allowance and the Company's matching contribution to Hulsizer's 401k plan that Hulsizer would have earned or received during the remainder of the Term as if he had continued in the Company's employ for the full term of this Agreement. Such amount shall be payable in one lump sum with no reduction for present value applied, (except for the Company's matching contribution to Hulsizer's 401k plan, which shall be paid by the Company into Hulsizer's 401k plan account).

       10.1   *Exemption From Section 409 A.*  The payments described in subsections (i) and (ii), above, shall be paid to Hulsizer within two and one-half (2-1/2) months following the end of the taxable year of Hulsizer or the Company, whichever is longer, in which the termination event occurs. To that end, the parties agree that the termination benefits described in sections (i) and (ii), above are intended to be exempt from Internal Revenue Code Section 409A pursuant to Treasury Regulation Section 1.409A-1(b)(4) as short-term deferrals and the termination benefits described in this Section 10 are intended to be exempt from such Section 409A pursuant to Treasury Regulation Section 1.409A-1(b)(1) as non-taxable benefits.

      11.   <u>Compliance with Internal Revenue Code Section 409A</u>. The parties intend that this Agreement shall be construed to comply with the provisions of Internal Revenue Code, Section 409A ("Section 409 A") and the applicable Treasury Regulations and other guidance issued thereunder in a manner that the payments to Hulsizer contemplated by this Agreement shall not be treated as deferred compensation under Internal Revenue Code, Section 409A, and shall not be subject to the tax on nonqualified deferred compensation which does not meet the requirements of Section 409A. Notwithstanding any provision in this Agreement to the contrary, this Agreement shall be interpreted, construed and conformed in accordance with Section 409A and the applicable Treasury Regulations and other guidance issued thereunder. If on the date of Hulsizer's separation from service from the Company (as defined in Treasury Regulation §1.409A-1(h)) Hulsizer is a specified employee (as defined in Section 409A and Treasury Regulation §1.409A-1(i)), no payment shall be made under this Agreement at any time during the six (6) month period following Hulsizer's separation from service (but only if such payments provide for the "deferral of compensation" within the meaning of Treasury Regulation §1.409A-1(b) and after application of the exemptions provided in Treasury Regulation §§1.409A-1(b)(4) and 1.409A-1(b)(9)(iii)), and any amounts otherwise payable during such six (6) month period shall be paid in a lump sum on the Company's first payroll payment date following expiration of such six (6) month period.

      12.   <u>Arbitration</u>.  The Company and Hulsizer agree that any unresolved dispute, controversy or claim arising out of or related to this Agreement, their employer-employee relationship or otherwise shall be resolved by arbitration administered by JAMS at its offices in San Diego, California, pursuant to its Comprehensive Arbitration Rules and Procedures. The



parties shall mutually choose one (1) neutral arbitrator who shall follow and apply California law. The arbitrator shall have the authority to order such discovery, by way of deposition, interrogatory, document production or otherwise, as the arbitrator considers necessary to a full and fair exploration of the issues in dispute, consistent with the expedited nature of arbitration. The parties shall be entitled to all remedies in arbitration that either party would be entitled to had the matter(s) been heard by a court having jurisdiction over the parties and the matter(s). Within the time fixed by the arbitrator and the parties, the arbitrator shall make a written award and determination which shall be final, binding and conclusive on the parties. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction of the parties. The parties shall bear their own attorneys' fees and costs, except the costs of the arbitrator and the arbitration proceeding shall be borne by the Company. This clause shall not preclude the parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Venue for all court proceedings shall be the San Diego Judicial District.

13.    Notices. Any notices required or permitted to be given under this Agreement shall be given in writing and shall be delivered (i) in person; (ii) by certified mail, postage prepaid, return receipt requested; (iii) by facsimile; or (iv) by a commercial overnight courier that guarantees next day delivery and provides a receipt, and such notices shall be addressed to the parties at their normal business or home address or to such other address as either party may from time to time specify in writing to the other party. Any notice shall be effective only upon delivery, which for any notice given by facsimile shall mean notice that has been received by the party to whom it is sent as evidenced by the printed confirmation.

14.    General Provisions.

14.1    *Entire Agreement.* This Agreement contains the entire agreement for employment of Hulsizer by the Company and shall be in addition to any policies and procedures of the Company, except those policies and procedures which may be inconsistent with the terms of this Agreement. To the extent any of the Company's policies or procedures are in conflict with this Agreement, this Agreement shall control. Except as herein provided, this Agreement supersedes any and all other agreements, either oral or in writing, between the parties hereto with respect to the employment of Hulsizer by the Company and contains all of the covenants and agreements between the parties with respect to that employment in any manner whatsoever. Each party acknowledges that no representation, inducements, promises, or agreements, oral or otherwise, have been made by any party, or anyone acting on behalf of any party, which are not embodied herein, and that no other agreement, statement, or promise not contained in this Agreement shall be valid or binding on either party. Notwithstanding the foregoing, this Agreement does not supersede, alter or revoke any other agreements or acknowledgments of receipt of any documents that Hulsizer has executed in favor of the Company including, but not limited to, agreements concerning the confidentiality and nondisclosure of the Company's proprietary information, employee handbooks, employment polices and the like, all of which shall remain in full force and effect to the extent the same are not in conflict with the terms of this Agreement.

14.2    *California Law.* This Agreement is drawn to be effective in California and shall be construed in accordance with California laws.



14.3    *Waiver.* A waiver of any term or condition of this Agreement shall not be construed as a general waiver by either party, and either party shall be free to reinstate any such term or condition with or without notice to the other.

14.4    *Assignment.* Hulsizer's rights and obligations under this Agreement are personal and not assignable. This Agreement may be assigned by the Company to any other entity. This Agreement shall be binding on and inure to the benefit of the parties' respective heirs, personal representatives, successors and assigns.

14.5    *Amendment.* Any amendment to or modification of this Agreement will be effective only if it is in writing and signed by Hulsizer, and the President of Board of CTV on behalf of CTV and the Company.

14.6    *Joint and Several Obligations.* All obligations of the Company as set forth in this agreement shall be deemed to be the joint and several obligations of CTV and the Company.

14.7    *Section Headings.* The section headings used in this Agreement are for reference and convenience only, and shall not in any way limit or amplify the terms and provisions hereof, nor enter into the interpretation of this Agreement.

14.8    *Legal Counsel.* Hulsizer acknowledges that Hulsizer has the right and opportunity to seek the advice of independent counsel of his own choosing with respect to his legal rights and obligations and the legal effect of this Agreement.    Hulsizer further acknowledges that Hulsizer has either sought or declined the advice of legal counsel and that Hulsizer has read this Agreement and is fully aware of the contents thereof and its meaning and legal effect.

14.9    *No Acts Contrary to Law.* Nothing contained in this Agreement shall be construed to require the commission of any act contrary to law, and whenever there is any conflict between any provision of this Agreement and any statute, law, ordinance, or regulation, then the latter shall prevail; but in such an event, the provisions of this Agreement so affected shall be curtailed and limited only to the extent necessary to bring it within the legal requirements. The several rights and remedies provided for in this Agreement shall be construed as being cumulative, and no one of them shall be deemed to be exclusive of the other or of any right or remedy allowed by law.

14.10    *Severability.* If any term or provision of this Agreement is determined to be illegal, unenforceable, or invalid in whole or in part for any reason, such illegal, unenforceable, or invalid provisions or part thereof shall be stricken from this Agreement, and such provision shall not affect the legality, enforceability, or validity of the remainder of this Agreement. If any provision or part thereof of this Agreement is stricken in accordance with the provisions of this section, then this stricken provision shall be replaced, to the extent possible, with a legal, enforceable, and valid provision that is as similar in tenor to the stricken provision as is legally possible.

[213565v2/4794-011]                    12



14.11  *Successors and Assigns.* Except as expressly provided in this Agreement, each and all of the covenants, terms, provisions, conditions, and agreements herein contained shall be binding upon and shall inure to the benefit of the successors, assigns and personal representatives of the parties hereto.

14.12  *No Presumption Against Drafter.*  The terms of this Agreement have been equally negotiated, drafted and reviewed by the parties.  The provisions contained herein shall not be construed or interpreted for or against any party because such party initially drafted or caused the party's legal representative to draft any of its provisions.

IN WITNESS WHEREOF, the Company has caused this Agreement to be signed by its duly authorized representative and Hulsizer has executed this Agreement on the day and year first written above.

The Company:                                        Hulsizer:

SOUTH BAY EXPRESSWAY, L.P.
a California limited partnership
By:  California Transportation Ventures, Inc.
a California corporation                            Greg Hulsizer
Its:  General Partner

By: _____

Name: Mark Wong

Title: President

**EXHIBIT E**

## SOUTH BAY EXPRESSWAY, L.P.

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") is entered into to be effective on January 1, 2010 by and between South Bay Expressway, L.P., a California limited partnership (the "Company" or "SBX"), and Anthony G. Evans ("Evans") with reference to the following recited facts:

### RECITALS

A.     Evans is currently employed by the Company as its Chief Financial Officer.

B.     The Board of Directors ("Board") of California Transportation Ventures, Inc. ("CTV"), the general partner of the Company, has determined that it is in the best interests of the Company and CTV to secure continuity in its executive management, and to also establish a working environment for its executive management that minimizes the distractions that may result from possible changes or reorganizations in which the Company might be involved.

C.     The Company has offered to continue the employment of Evans as its Chief Financial Officer for a specific term and Evans has accepted such employment pursuant to the terms of this Agreement.

D.     Evans' current employment is pursuant to that certain letter agreement dated February 1, 2003 executed by Nicholas James on behalf of CTV and the Company, and by Evans, as amended by that certain letter agreement dated June 29, 2004 executed by Greg Hulsizer on behalf of CTV and the Company, and by Evans.  The parties intend that this Agreement shall replace and supersede such letter agreements in their entirety.

NOW, THEREFORE, incorporating the above recitals, which are  material elements of this Agreement, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and Evans agree as follows:

### AGREEMENT

1.     <u>Employment Term</u>.    The term of employment and this Agreement shall commence on January 1, 2010 and continue for a period of one (1) year ("Term"), unless earlier terminated in accordance with Section 7 of this Agreement.

1.1     *Renewal of Agreement*.  The Company shall notify Evans in writing on or before June 30, 2010 whether it will renew or not renew the Term beyond its initial period.  In the event that the Company notifies Evans that it will renew the Term, Evans will notify Company within five (5) business days if he wishes to renew the Term. In the event the Company notifies Evans that it will not renew the Term, Evans agrees to continue his employment with the Company through December 31, 2010, subject to the terms and conditions

of this Agreement, including the provisions for early termination of the Term.  In the event the Company fails to notify Evans whether it will renew or not renew the Term beyond its initial period, such failure shall be deemed as the Company electing not to renew the Term.

2.    <u>Replacement of Prior Employment Agreement</u>.  That certain letter agreement dated February 1, 2003, executed by Nicholas James on behalf of CTV and the Company, and by Evans, and that certain letter agreement dated June 29, 2004 executed by Greg Hulsizer on behalf of CTV and the Company, and by Evans, are hereby rescinded in their entirety and replaced and superseded by this Agreement.

3.    <u>Title</u>.  Evans' title shall be Chief Financial Officer of the Company.

4.    <u>Duties</u>.

4.1    *Continuation of Previous Duties*.  Evans shall continue to have all of the authority, duties and responsibilities that he previously had in his employment with Company with respect to managing project financing activities and relationships, including forecasting, cash management, loan documents/covenants, reporting and lender relations.  He shall also continue his responsibilities for Right of Way/real property management, property tax appeals, franchise issues with Caltrans, insurance, and construction and litigation support, and such other duties commensurate with his position as may be assigned to him from time to time by the Chief Executive Officer.

4.2    *Reporting*.  Evans shall report to and be accountable to the Chief Executive Officer.  Evans will observe and comply with Company's rules, regulations and policies in the performance of his duties to the extent they are not inconsistent with this Agreement, and carry out and perform orders, directions and policies as may be prescribed by the Chief Executive Officer from time to time.

4.3    *Time and Attention*.  Evans agrees, to the best of his ability and experience, to loyally and conscientiously perform all of the duties and obligations required by the terms of this Agreement.  Evans shall be an exempt employee (under California labor law) and devote substantially all of his business time and attention to the Company throughout the Term.  Notwithstanding anything to the contrary herein, Evans may devote reasonable amounts of time to personal, charitable and professional activities so long as such activities, do not materially interfere with Evans' duties hereunder.

5.    <u>Compensation</u>.

5.1    *Base Salary*.  During the Term the Company shall compensate Evans at an annual salary of Two Hundred Forty Thousand Dollars ($240,000) ("Base Salary"), payable bi-weekly in accordance with the Company's payroll practices.

5.2    *Performance Bonus*. *Performance Bonus*.  Evans shall be paid a quarterly performance bonus based on his performance; subject to CEO and Board approval. An amount equal to 50% of Evans' base salary ($120,000) shall be included in the 2010 budget and be

available for payment of such performance bonus. In reviewing Evans' performance and performance bonus, the CEO and Board shall take into account Evans' work efforts and results in implementing Board directives, SBX financial performance relative to budget and achievement of KPIs and performance objectives within his responsibilities as CFO. The CEO and Board shall consider Evans' performance and as it deems appropriate, award Evans a Performance Bonus quarterly, according to the following schedule, criteria and targets amounts:

| Bonus Date | Criteria | Target Bonus |
|---|---|---|
| March 15, 2010 | Budgeted EBITDA and KPI/Work Program achievement | $30,000 |
| June 15, 2010 | Budgeted EBITDA and KPI/Work Program achievement | $30,000 |
| September 15, 2010 | Budgeted EBITDA and KPI/Work Program achievement | $30,000 |
| December 15, 2010 | Budgeted EBITDA and KPI/Work Program achievement | $30,000 |

It is understood that achievement of budgeted EBITDA and certain KPI and/or Work Program items are subject to influence by factors outside Evans' control (e.g. local economic impacts impacting traffic and revenue, items requiring lender approval, which may or may not be granted, etc.) and it is agreed that such factors beyond Evans' control shall be taken into consideration by the CEO and Board in considering award of any Performance Bonus to Evans under this Agreement.

     5.3    *First Retention Incentive.*  On June 30, 2010, or concurrent with the first bi-weekly payroll thereafter, the Company shall pay Evans a first retention incentive equal to fifty percent (50%) of his Base Salary (i.e., $120,000), ("First Retention Incentive") if Evans has been employed by the Company (or any of its affiliates) for any length of time between January 1, 2010 and June 30, 2010.

     5.4    *Second Retention Incentive.*  On December 31, 2010, the Company shall pay Evans a second retention incentive equal to fifty percent (50%) of his Base Salary (i.e., $120,000), ("Second Retention Incentive") if (i) Evans has been employed by the Company (or any of its affiliates) for any length of time between January 1, 2010 and December 31, 2010; and (ii) on or before June 30, 2010, the Company has notified Evans that it will not renew the Term beyond its initial period (or failed to give written notification, as the case may be); or the Company has notified Evans on or before June 30, 2010, that it will renew the Term but the Company and Evans have not executed a new employment agreement or renewal and extension of this Agreement on or before July 31, 2010.

     5.5    All compensation shall be less amounts required to be withheld under applicable law and voluntary amounts requested to be withheld by Evans.

     6.    <u>Benefits</u>.  Evans shall be entitled to the following benefits in addition to such other benefits as are generally provided to other employees of the Company in upper management positions:

A.    *Business Expenses.*  The Company shall directly pay or reimburse Evans for his reasonable business expenses incurred in performing his duties under this Agreement which may include, but are not limited to, parking, meals, travel and transportation expenses, lodging and other reasonable and necessary business related expenses. Evans shall provide documentation for all such expenses in accordance with the Company's policies. Reimbursement of all expenses incurred by Evans, as described in herein, shall be limited to those expenses typically tax-deductible as a company's business expenses under the rules and regulations of the Internal Revenue Code.

B.    *Group Insurance.*  Evans (and his dependents, as applicable) shall be entitled to all dental, health, disability, life insurance benefits and other similar plans pursuant to and in accordance with the terms and conditions of the Company's employee group policies and plans, except that the Company shall pay 100% of the premiums for all such policies including reimbursement of any deductible applied under the health and dental care policies. The proceeds of insurance, if any, that Evans may receive shall belong to Evans.

C.    *Retirement/Pension Plans.*  Evans shall be vested and entitled to participate in the Company's 401k, retirement and/or pension plans, and such other similar plans as may be established by the Company under the same terms, conditions and benefits as for other management level employees of the Company.

D.    *Vacation and Holidays.*  Evans shall be entitled to twenty (25) days of paid vacation leave during the Term in addition to his current balance of 24 days of previously accrued vacation.  Evans shall not be subject to any limits on the number of days of paid vacation that may accrue.  All unused vacation remaining at the end of the Term shall be paid to Evans.  Evans shall also be entitled to the same paid holidays given by the Company to other management level employees.

E.    *Sick Leave.*    Evans shall be entitled to paid sick leave in accordance with the Company's employee policies.

F.    *Company Insurance.*  The Company, at its expense, shall cover Evans as an insured under the Company's standard directors and officers insurance policy insuring Evans against liability arising out of the performance of his duties, and shall indemnify and hold Evans harmless from liability arising out of his services hereunder to the fullest extent allowed under law, including but not limited to advancement of legal fees.  The provisions of this subsection shall survive the termination of the Term.

G.    *Other Benefits.*  The Company shall make available to Evans any and all other employee or fringe benefits (in accordance with their terms and conditions) which Company may generally make available to its other management level employees.

7.    Termination.  The Term shall end and Evans' employment with Company shall terminate upon the happening of any one of the following events:

A.    The Term expires.

B.    Evans becomes disabled.  For purposes of this Agreement, "disabled" means the same as in any applicable disability insurance policy covering Evans, or in the absence thereof, that Evans is incapable of performing his normal duties under this Agreement, with or without reasonable accommodation, because of a physical or mental incapacity that has prevented Evans from performing his duties for a period of ninety (90) consecutive calendar days and it is reasonably determined that such incapacity is likely to continue for at least another ninety (90) days.  Such determination shall be determined in good faith by the Board in consultation with Hulsizer's treating physician(s).  Termination under this subsection 7.B shall be effective on the date of the determination that Evans' incapacity is likely to continue for at least another ninety (90) days.

C.    The death of Evans.

D.    The Company terminates Evans' employment for Good Cause (as such term is defined herein) by written notice to Evans specifying in reasonable detail the particular factors forming the basis for such Good Cause;

F.    The Company terminates Evans' employment without Good Cause by written notice to Evans.

G.    Evans voluntarily resigns his employment for other than Good Reason (as such term is defined herein) by written notice to the Chief Executive Officer.

H.    Evans resigns his employment for Good Reason by written notice to the Chief Executive Officer specifying in reasonable detail the particular factors forming the basis for such Good Reason.  Good Reason shall include a Change of Control (as such term is defined herein).

7.1    Termination Date.  The "Termination Date" is the date as of which Evans' employment with the Company terminates for any reason.  Any notice of termination given pursuant to the provisions of this Agreement shall specify the Termination Date.

7.2    Definitions.  For purposes of this Agreement, the following terms shall have the following meanings:

A.    "Good Cause" means and shall exist if, and only if:

(i)    Evans willfully and repeatedly fails or refuses to attempt in good faith to perform his obligations under this Agreement in any material respect, provided that Good Cause shall not exist unless Company has first provided Evans with written notice specifying in reasonable detail the particular factors forming the basis for such failure or refusal and such failure or refusal shall not have been cured by Evans within thirty (30) days after such notice or, if impracticable of being cured within such thirty (30) day period, such longer period as may reasonably be necessary to accomplish the cure;

(ii)    Evans has been convicted of a crime which constitutes a felony under applicable law or has entered a plea of guilty or nolo contendere with respect thereto; or

(iii)    Evans engages in willful misconduct that is materially detrimental to the reputation, character or standing of the Company, provided that no act shall be deemed detrimental if done in good faith that such act is not adverse to the best interests of the Company.

B.    "Good Reason" as used in this Agreement involves circumstances that support a determination that Evans' resignation is the functional equivalent of an involuntary termination, and shall exist upon the occurrence of any of the following:

(i)    a material diminution in Evans' responsibilities, compensation and/or benefits described Sections 5 and 6 of this Agreement;

(ii)    an assignment to Evans or change of any duties inconsistent in any material respect with Evans' position (including status, office, titles and reporting relationships), authority, duties or responsibilities, or any other action or actions by Company which when taken as a whole results in a material diminution in Evans' position, authority, duties or responsibilities.  Excluded for this purpose shall be any isolated, immaterial and inadvertent action not taken in bad faith and which is remedied by Company immediately after receipt of notice thereof given by Evans;

(iii)    any change requiring Evans to report to an employee or officer instead of directly to the Chief Executive Officer;

(iv)    a relocation of the Company's business office where Evans performs a substantial part of his duties to a location more than fifty (50) miles from its location as of the date of this Agreement (unless such relocation is recommended by Evans, consented to by Evans or closer to Evans' primary residence), or the Company requires Evans to be based at any location other than within fifty (50) miles of the Company's current office location (except for requirements of temporary travel on the Company's business to an extent substantially consistent with the Evans' business travel obligations existing immediately prior to the date of this Agreement);

(v)    a Change in Control of the Company as defined below;

(vi)    SBX requests, through any person or group of persons superior in authority to Evans, that with respect to the performance of his duties, he commit an act or omit to do an act that Evans believes to be illegal after first consulting with independent legal counsel knowledgeable on the subject matter of the act or omission;

(vii)    any member of the Board or CEO requests in writing to Evans that Evans resign his employment;

(viii)  the Company is a debtor under title 11 of the United States Code ("Bankruptcy Code") and an Order approving the assumption of this Agreement under Section 365 of the Bankruptcy Code has not been entered on the docket of the Bankruptcy Court by no later than the 45th day after the entry of the order for relief, or,

(ix)  any other action or inaction by the Company that constitutes a material breach of one or more of the terms of this Agreement.

In all cases, Good Reason for Evans to resign his employment shall not exist unless: (i) Evans has first provided the Chief Executive Officer with written notice specifying in reasonable detail the particular factors forming the basis for such Good Reason.  Such notice must be given by Evans within ninety (90) days of the initial existence of a condition of Good Reason and the Company shall have a period of thirty (30) days from receipt of such notice to cure such condition; and (ii) Evans actually resigns and terminates his employment within a period of time not exceeding six (6) months following knowledge by Evans of a condition of Good Reason for his resignation.  Failure by Evans to resign within such period will be deemed his acceptance of the circumstances that may have given rise to the existence of Good Reason.

C.  "Change in Control" means: (i) any person or entity other than the existing owners becomes the beneficial owner of CTV or the Company or a substantial part of SBX's assets; (ii) approval has been given for a consolidation, recombination or merger of SBX in which SBX is not the continuing or surviving entity; (iii) there is a sale, lease, exchange, foreclosure, repossession or other transfer of all or substantially all of the assets of SBX in one related transaction; or (iv) the majority ownership interest in SBX is no longer held by the current majority interest holder.  In all cases, a Change in Control shall not occur if Evans has been offered and accepted or rejected employment by any entity that substantially succeeds to SBX's interests that is substantially the same as his employment with SBX in terms of compensation, status, title, duties and responsibilities and the Company or the new owner are not in breach of this Agreement.

8.  Termination Compensation Upon Expiration of the Term, Voluntary Resignation, Termination for Good Cause, or Disability.

8.1  *Upon Expiration of the Term.*  Upon expiration of the Term, the Company shall pay Evans his earned but unpaid compensation including, without limitation, the compensation otherwise due and payable pursuant to Section 5 (i.e. Base Salary, Performance Bonus, First Retention Incentive and Second Retention Incentive) of this Agreement, Evans' accrued and unused vacation leave, and all other amounts which constitute wages under California law), unpaid reimbursements and other unpaid expenses due or accrued as of the date of the end of the Term (and as determined consistently with Treasury Regulation Section 1.409A-1(h)(1)(ii)).  Payment of such amounts shall be made at the time and in the manner prescribed by California law applicable to the payment of wages.  In addition, at Evans' expense, the Company shall provide continuity of only those benefits as described in Section 6, which by law must be continued after termination of employment.  The time and manner of payment or other delivery of such continued benefits and the recipients of such benefits shall be determined

according to the terms and conditions of the applicable plans and programs. The payments and benefits as described in Section 5 and this Section 8.1 shall be referred to in this Agreement as the "Standard Termination Entitlements."

        8.2    *Upon Evans' Voluntary Resignation of Employment.*    In the event of Evans' voluntary resignation of his employment for other than Good Reason, the Company shall pay Evans only the Standard Termination Entitlements which have become due or are accrued through the date of such resignation. Payment of monetary amounts shall be made at the time and in the manner prescribed by California law applicable to the payment of wages.

        8.3    *Upon Termination For Good Cause.*  In the event the Company terminates Evans' employment for Good Cause, the Company shall pay Evans only the Standard Termination Entitlements which have become due or are accrued through the date of such termination. Payment of monetary amounts shall be made at the time and in the manner prescribed by California law applicable to the payment of wages.

        8.4    *Upon Evans' Work-Related Disability.*  If Evans becomes disabled (as that term is defined in Section 7.B) while employed by the Company and such disability is directly related to Evans' performance of his duties, the Company shall pay to Evans (or his legal personal representative entitled thereto, if applicable), the Standard Termination Entitlements which have become due or are accrued through the date of termination on account of disability, and so much of the First Retention Bonus and Second Retention Bonus as would otherwise be payable to Evans under the terms of this Agreement, prorated based on the number of full months Evans worked from January 1, 2010 to the date of termination of his employment on account of such disability.

        8.5    *Upon Evans' Non Work-Related Disability.*  If Evans becomes disabled (as that term is defined in Section 7.B) while employed by the Company, and such disability is not directly related to Evans' performance of his duties, the Company shall pay to Evans (or his legal personal representative entitled thereto, if applicable), the Standard Termination Entitlements which have become due or are accrued through the date of termination on account of disability.

        8.6    *Full Compensation.*  The compensation described above in this Section 8 shall be the full and only compensation payable by the Company to Evans and Evans shall not be entitled to any other payments of any type including, without limitation, the right to receive any continuation of benefits unless otherwise provided by this Agreement or by law.

        9.    <u>Termination Compensation Upon Evans' Death</u>.  If Evans dies while employed by the Company, upon his death, the Company shall pay to Evans' estate (or such other person who shall be legally entitled thereto):

        (i) the Standard Termination Entitlements which have become due or are accrued through the date of death; and

(ii) any amount of the First Retention Incentive and the Second Retention Incentive not already paid to Evans, notwithstanding the fact that, on account of his death, Evans was not employed by the Company at the time such payments were otherwise payable.

9.1     *Benefits to Dependents*.  In addition to the foregoing, the Company shall provide the benefits, if any, due to Evans' estate, surviving dependents or his designated beneficiaries under the employee benefit plans and programs provided for employees of the Company in which Evans participated. The amount, time and manner of payment or other delivery of such benefits and the recipients of such benefits shall be determined according to the terms and conditions of the applicable plans and programs.

10.    Termination Compensation Upon Resignation For Good Reason or Termination Without Good Cause.  In the event Evans resigns his employment for Good Reason or the Company terminates Evans' employment without Good Cause, upon such resignation or termination, the Company shall pay or provide to Evans the Standard Termination Entitlements which have become due or are accrued through the date of such resignation or termination. Payment of monetary amounts shall be made at the time and in the manner prescribed by California law applicable to the payment of wages.  In addition, the Company shall, subject to Evans' execution, within thirty (30) days, of a general release of claims in a form reasonably satisfactory to the Company:

(i) provide, at the Company's expense, continued dental, health, disability and life insurance coverages and benefits pursuant to and in accordance with the terms and conditions of the Company's employee group policies and plans for Evans (and his dependents, as applicable), until the date Evans first becomes eligible for such coverages and benefits under the policies or plans maintained by a subsequent employer or December 31, 2010, whichever is earlier;

(ii) pay an amount equal to the total amount of the Base Salary, budgeted Performance Bonus referenced in Section 5.2 of this Agreement, accrued vacation, First Retention Incentive, Second Retention Incentive, and the Company's matching contribution to Evans' 401k plan that Evans would have earned or received during the remainder of the Term as if he had continued in the Company's employ.  Such amount shall be payable in one lump sum with no reduction for present value applied (except for the Company's matching contribution to Evans' 401k plan, which shall be paid by the Company into Evans' 401k plan account).

10.1     *Exemption From Section 409 A*.  The payments described in subsections (i) and (ii), above, shall be paid to Evans within two and one-half (2-1/2) months following the end of the taxable year of Evans or the Company, whichever is longer, in which the termination event occurs. To that end, the parties agree that the termination benefits described in sections (i) and (ii), above are intended to be exempt from Internal Revenue Code Section 409A pursuant to Treasury Regulation Section 1.409A-1(b)(4) as short-term deferrals and the termination benefits described in this Section 10 are intended to be exempt from such Section 409A pursuant to Treasury Regulation Section 1.409A-1(b)(1) as non-taxable benefits.

11.    Compliance with Internal Revenue Code Section 409A. The parties intend that this Agreement shall be construed to comply with the provisions of Internal Revenue Code,

Section 409A ("Section 409 A") and the applicable Treasury Regulations and other guidance issued thereunder in a manner that the payments to Evans contemplated by this Agreement shall not be treated as deferred compensation under Internal Revenue Code, Section 409A, and shall not be subject to the tax on nonqualified deferred compensation which does not meet the requirements of Section 409A. Notwithstanding any provision in this Agreement to the contrary, this Agreement shall be interpreted, construed and conformed in accordance with Section 409A and the applicable Treasury Regulations and other guidance issued thereunder. If on the date of Evans' separation from service from the Company (as defined in Treasury Regulation §1.409A-1(h)) Evans is a specified employee (as defined in Section 409A and Treasury Regulation §1.409A-1(i)), no payment shall be made under this Agreement at any time during the six (6) month period following Evans' separation from service (but only if such payments provide for the "deferral of compensation" within the meaning of Treasury Regulation §1.409A-1(b) and after application of the exemptions provided in Treasury Regulation §§1.409A-1(b)(4) and 1.409A-1(b)(9)(iii)), and any amounts otherwise payable during such six (6) month period shall be paid in a lump sum on the Company's first payroll payment date following expiration of such six (6) month period.

12.    Arbitration.    The Company and Evans agree that any unresolved dispute, controversy or claim arising out of or related to this Agreement, their employer-employee relationship or otherwise shall be resolved by arbitration administered by JAMS at its offices in San Diego, California, pursuant to its Comprehensive Arbitration Rules and Procedures. The parties shall mutually choose one (1) neutral arbitrator who shall follow and apply California law. The arbitrator shall have the authority to order such discovery, by way of deposition, interrogatory, document production or otherwise, as the arbitrator considers necessary to a full and fair exploration of the issues in dispute, consistent with the expedited nature of arbitration. The parties shall be entitled to all remedies in arbitration that either party would be entitled to had the matter(s) been heard by a court having jurisdiction over the parties and the matter(s). Within the time fixed by the arbitrator and the parties, the arbitrator shall make a written award and determination which shall be final, binding and conclusive on the parties. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction of the parties. The parties shall bear their own attorneys' fees and costs, except the costs of the arbitrator and the arbitration proceeding shall be borne by the Company. This clause shall not preclude the parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Venue for any court proceedings shall be the San Diego Judicial District.

13.    Notices.    Any notices required or permitted to be given under this Agreement shall be given in writing and shall be delivered (i) in person; (ii) by certified mail, postage prepaid, return receipt requested; (iii) by facsimile; or (iv) by a commercial overnight courier that guarantees next day delivery and provides a receipt, and such notices shall be addressed to the parties at their normal business or home address or to such other address as either party may from time to time specify in writing to the other party. Any notice shall be effective only upon delivery, which for any notice given by facsimile shall mean notice that has been received by the party to whom it is sent as evidenced by the printed confirmation.

14.    <u>General Provisions</u>.

14.1    *Entire Agreement.*    This Agreement contains the entire agreement for employment of Evans by the Company and shall be in addition to any policies and procedures of the Company, except those policies and procedures which may be inconsistent with the terms of this Agreement.  To the extent any of the Company's policies or procedures are in conflict with this Agreement, this Agreement shall control.  Except as herein provided, this Agreement supersedes any and all other agreements, either oral or in writing, between the parties hereto with respect to the employment of Evans by the Company and contains all of the covenants and agreements between the parties with respect to that employment in any manner whatsoever.  Each party acknowledges that no representation, inducements, promises, or agreements, oral or otherwise, have been made by any party, or anyone acting on behalf of any party, which are not embodied herein, and that no other agreement, statement, or promise not contained in this Agreement shall be valid or binding on either party.  Notwithstanding the foregoing, this Agreement does not supersede, alter or revoke any other agreements or acknowledgments of receipt of any documents that Evans has executed in favor of the Company including, but not limited to, agreements concerning the confidentiality and nondisclosure of the Company's proprietary information, employee handbooks, employment polices and the like, all of which shall remain in full force and effect to the extent the same are not in conflict with the terms of this Agreement.

14.2    *California Law.*    This Agreement is drawn to be effective in California and shall be construed in accordance with California laws.

14.3    *Waiver.*    A waiver of any term or condition of this Agreement shall not be construed as a general waiver by either party, and either party shall be free to reinstate any such term or condition with or without notice to the other.

14.4    *Assignment.*    Evans' rights and obligations under this Agreement are personal and not assignable.  This Agreement may be assigned by the Company to any other entity.  This Agreement shall be binding on and inure to the benefit of the parties' respective heirs, personal representatives, successors and assigns.

14.5    *Amendment.*    Any amendment to or modification of this Agreement will be effective only if it is in writing and signed by Evans, and the President of CTV on behalf of CTV and the Company.

14.6    *Joint and Several Obligations.*    All obligations of the Company as set forth in this agreement shall be deemed to be the joint and several obligations of CTV and the Company.

14.7    *Section Headings.*    The section headings used in this Agreement are for reference and convenience only, and shall not in any way limit or amplify the terms and provisions hereof, nor enter into the interpretation of this Agreement.

14.8    *Legal Counsel.*    Evans acknowledges that Evans has the right and opportunity to seek the advice of independent counsel of his own choosing with respect to his legal rights and obligations and the legal effect of this Agreement.  Evans further acknowledges that Evans has either sought or declined the advice of legal counsel and that Evans has read this Agreement and is fully aware of the contents thereof and its meaning and legal effect.

14.9    *No Acts Contrary to Law.*    Nothing contained in this Agreement shall be construed to require the commission of any act contrary to law, and whenever there is any conflict between any provision of this Agreement and any statute, law, ordinance, or regulation, then the latter shall prevail; but in such an event, the provisions of this Agreement so affected shall be curtailed and limited only to the extent necessary to bring it within the legal requirements.  The several rights and remedies provided for in this Agreement shall be construed as being cumulative, and no one of them shall be deemed to be exclusive of the other or of any right or remedy allowed by law.

14.10    *Severability.*    If any term or provision of this Agreement is determined to be illegal, unenforceable, or invalid in whole or in part for any reason, such illegal, unenforceable, or invalid provisions or part thereof shall be stricken from this Agreement, and such provision shall not affect the legality, enforceability, or validity of the remainder of this Agreement.  If any provision or part thereof of this Agreement is stricken in accordance with the provisions of this section, then this stricken provision shall be replaced, to the extent possible, with a legal, enforceable, and valid provision that is as similar in tenor to the stricken provision as is legally possible.

14.11    *Successors and Assigns.* Except as expressly provided in this Agreement, each and all of the covenants, terms, provisions, conditions, and agreements herein contained shall be binding upon and shall inure to the benefit of the successors, assigns and personal representatives of the parties hereto.

14.12    *No Presumption Against Drafter.*  The terms of this Agreement have been equally negotiated, drafted and reviewed by the parties.  The provisions contained herein shall not be construed or interpreted for or against any party because such party initially drafted or caused the party's legal representative to draft any of its provisions.

IN WITNESS WHEREOF, the Company has caused this Agreement to be signed by its duly authorized representative and Evans has executed this Agreement on the day and year first written above.

The Company:

Evans:

SOUTH BAY EXPRESSWAY, L.P.
a California limited partnership
By:  California Transportation Ventures, Inc.
a California corporation
Its:   General Partner

_____
Anthony G. Evans

By: _____
Name: _____
Title: _____

**EXHIBIT F**

February 22, 2010



**South Bay Expressway**

*Put the fun back in driving!*

1129 La Media Road, San Diego, CA 92154
p. 619.710.4000 • f. 619.710.4097
s o u t h b a y e x p r e s s w a y . c o m

Theresa Weekes, CPA
2011 Pinon Hills Drive
Chula Vista, CA 91913

Re:  <u>Amendment of Employment Terms</u>

Dear Theresa:

This letter is to meant to fully amend and replace, in its entirety, the letter agreement dated May 8, 2008 under which you were offered, and signed to accept, your initial employment with South Bay Expressway, L.P. ("SBX").  The terms and conditions for your employment, as set forth in this letter will be effective January 1, 2010.

The confidentiality and nondisclosure agreement, the agreement limiting the statute of limitations for employment related claims and requiring arbitration for all such claims as mentioned in the May 8, 2008 letter, and any other agreements or acknowledgements you have signed in favor of SBX will still remain in full force and effect (except to the extent they may be inconsistent with the terms and conditions stated in this letter, which case this letter will control).

As the Chief Accounting Officer, you will continue to report to me as the Chief Executive Officer, and your general responsibilities will include:

- Strategic leadership of the company's finance, administrative and customer service center functions
- Overall responsibility for financial accounting and reporting, auditing, e-commerce transactions, cash/credit management, banking and lender relations, property and risk management, administration of SBX's automated financial accounting system; payroll and benefits administration and other responsibilities associated with your position
- Managing SBX's banking relationships, SBX's insurance program and human resources programs
- All other duties and responsibilities associated with the position and as may be assigned to you from time to time, either verbally or in writing

As a member of the SBX management team, you will be expected to effectively coordinate with the other members of the management team, our service providers, and our public partners.  From time to time, you may be called upon to represent SBX on various regional projects and issues.  You may also be called on to represent California Transportation Ventures, Inc. (CTV), the managing partner of SBX, and/or our affiliated companies regarding other business activities.  From time to time, your assignment may require travel out of the area.  Your duties will require you to carry a company-provided cellular phone/blackberry and to be available to respond to emergencies on a twenty-four (24) hour, seven (7) day per week basis.  You will also be provided a laptop computer for use in the office and when offsite.  In order for you to fulfill your responsibilities as Chief

[213600v3/4794-011]

Theresa Weekes, CPA
February 22, 2010
Page 2

Accounting Officer, it is expected that your residence or alternate living arrangements will continue to be located so as to allow timely response to the SBX office, should your presence be required during non-business hours for emergencies or other matters.

As before, your employment with SBX will be at-will and not for any specific term and may be terminated by you or SBX at any time, with or without cause and with or without notice. The at-will nature of your employment will be the only and entire agreement between you and SBX concerning the duration of your employment and the circumstances under which either you or SBX may terminate the employment relationship. No person affiliated with SBX or CTV has the authority to enter into any oral agreement that changes the at-will status of employment with SBX. The at-will term of your employment can only be changed in a writing signed by you and the Chief Executive Officer of CTV on behalf of SBX, which writing expressly states the intention to modify the at-will term of your employment. By signing below and accepting this offer, you acknowledge and agree that your employment with SBX will be strictly at-will, and nothing, unless expressly stated herein, will create any implied or express contract requiring cause for termination of employment.

Your annual salary, as it is currently, will be $139,000 ("Base Salary"), paid according to SBX's regular paydays, directly deposited, if you choose, to your specified bank account. The Chief Accounting Officer position is an "exempt" position. You will not be entitled to compensation for any overtime hours worked, and are expected to work whatever hours are necessary to effectively fulfill your responsibilities.

As in the past, your performance will be formally reviewed in December of each year, with salary adjustment, if any, effective January 1 of the following year. Your next opportunity to be considered for a Base Salary adjustment will be in December 2010. You can also expect periodic, less formal performance reviews that we find quite valuable to keep our team running smoothly.

By no later than March 31, 2010, SBX will conduct a market analysis for your position to establish where your current compensation stands relative to similar positions in the San Diego area. After the analysis is completed, we have agreed to review your Base Salary and to consider an adjustment in advance of December 2010. Should the market analysis indicate that your base salary is below the 50th percentile for similar positions in the San Diego area, effective July 1, 2010, SBX will increase your Base Salary to the 50th percentile, or to an annual Base Salary of $150,000, whichever is less.

You will continue to receive SBX's standard employee benefits package, including sick leave, life and disability insurance coverage and participation in the 401k plan, subject to the requirements for participation, waiting periods, vesting and otherwise as provided by the benefit plans. Effective January 1, 2010, you will be entitled to 20 days paid vacation per year until you reach the maximum accrual provided under SBX's vacation policy, at

Theresa Weekes, CPA
February 22, 2010
Page 3

which time vacation accrual will cease and begin again once you are below the maximum allowed accrual.

Starting in December 2010, you will be considered for annual discretionary bonus compensation of up to a maximum of twenty percent (20%) of your annual Base Salary. These bonuses are based on SBX achieving its financial goals and your accomplishment of specific work program goals and are paid, if at all, in January.  To the extent that you meet all of your KPI and Work Program goals (unless affected by circumstances outside of your control), you will be entitled to a minimum performance bonus equal to 10% of your annual Base Salary.

Additionally, SBX offers the following financial benefits to you:

      A.   *Severance Benefit.*  Although your employment continues to be at-will, allowing either you or SBX to terminate the employment relationship at anytime, with or without notice and with or without cause, SBX will pay you a special, one time only severance benefit equal to six (6) months of your then current Base Salary only if (i) SBX terminates your employment without Good Cause;[1] or (ii) you resign your employment for Good Reason[2] by giving written notice to the Chief Executive Officer of SBX

---

[1] "Good Cause" means and shall exist if, and only if:
      (i) you willfully breach or habitually neglect and/or demonstrate a continued incapacity to perform your duties;
      (ii) you commit acts of dishonesty, fraud, misrepresentation, or other acts that, as determined by SBX in its reasonable discretion, prevent or could prevent the effective performance of your duties
      (iii) you are convicted of a crime which constitutes a felony under applicable law or enter a plea of guilty or nolo contendere with respect thereto;
      (iv) you engage in any fraudulent or willful misconduct that is materially detrimental to the interests, reputation, character or standing of SBX; or
      (v) you engage in acts or omissions that give rise to termination of your employment under SBX's employment policies.
      In the case of Good Cause SBX must give written notice to you specifying in reasonable detail the particular factors forming the basis for such Good Cause.

[2] "Good Reason" as used herein involves circumstances that generally support a determination that your resignation is the functional equivalent of an involuntary termination, and shall exist upon the occurrence of any of the following:
      (i) a material diminution in your compensation and/or benefits described herein (including the severance benefit and retention incentive);
      (ii) an assignment to you or change of any duties inconsistent in any material respect with your position (including status, title and reporting relationships), authority, duties or responsibilities, or any other action or actions by SBX which when taken as a whole results in a material diminution in your position, authority, duties or responsibilities.  Excluded for this purpose shall be any isolated, immaterial and inadvertent action not taken in bad faith and which is remedied by SBX immediately after receipt of your written notice describing such action;
      (iii) a material diminution in the budget over which you retain authority, if any;

Theresa Weekes, CPA
February 22, 2010
Page 4

specifying in reasonable detail the particular factors forming the basis for such Good Reason. If you decide to terminate your employment for any reason other than Good Reason, or your employment terminates on account of your death or you become disabled,[3] and the disability is not directly related to your work, you will not be entitled, and will not receive, any portion of this severance benefit.

As a condition to the receipt of any severance benefit, you will be required to sign SBX's form of severance agreement and general release ("Release") within thirty (30) days after termination of your employment. If payable, at SBX's option, the severance benefit will be paid to you, less all applicable state and federal tax withholding and other lawful deductions, in one lump sum on the next payday following SBX's receipt of the Release, or in installments on SBX's normal paydays over a six (6) month period. However, for the severance benefit to qualify under the short-deferral exemption under Internal Revenue Code Section 409A ("Section 409 A") and Treasury Regulation Section 1.409A-1(b)(4), all severance benefit payments payable to you will be paid on or before

---

(iv) a relocation of the Company's business office where you perform a substantial part of your duties to a location more than twenty-five (25) miles from its present location (unless such relocation is consented to by you or closer to your residence), or the Company requires you to be based at any location other than within twenty-five (25) miles of the Company's present office location (except for requirements of temporary travel on the Company's business to an extent substantially consistent with your business travel obligations existing immediately prior to the date of this letter);

(v) SBX undergoes a Change of Control; or

(vi) any other action or inaction by the SBX that constitutes a material breach of one or more of the terms set forth in this letter.

SBX shall undergo a Change in Control if: (i) any person or entity other than CTV or any affiliate of CTV becomes the beneficial owner of SBX or a substantial part of SBX's assets; (ii) approval has been given for a consolidation, recombination or merger of SBX in which SBX is not the continuing or surviving entity; (iii) there is a sale, lease, exchange, foreclosure, repossession or other transfer of all or substantially all of the assets of SBX in one related transaction; or (iv) the majority ownership interest in SBX is no longer held the current majority interest holder. In all cases, a Change in Control shall not occur if you have been offered and accepted or rejected employment by any entity that substantially succeeds to SBX's interests that is substantially the same as your employment with SBX in terms of compensation, title, duties and responsibilities.

In all cases, Good Reason for you to resign your employment shall not exist unless: (i) you first provide the Chief Executive Officer of SBX with written notice specifying in reasonable detail the particular factors forming the basis for such Good Reason. Such notice must be given by you within ninety (90) days of the initial existence of a condition of Good Reason and SBX shall have a period of thirty (30) days from receipt of such notice to cure such condition; and (ii) you actually resign and terminate your employment within a period of time not exceeding six (6) months following the initial existence of a condition of Good Reason for your resignation. Your failure to resign within such period will be deemed your acceptance of the circumstances that may have given rise to the existence of Good Reason.

[3] "Disabled" means the same as in any applicable SBX disability insurance policy covering you, or in the absence thereof, that you cannot perform your essential job functions for a continuous period of sixty (60) days, even with reasonable accommodations, due to a physical or mental incapacity. If your employment is terminated due to disability, the termination shall be effective on such sixtieth (60th) day.

Theresa Weekes, CPA
February 22, 2010
Page 5

March 15th of the year following the year in which the termination occurs, or on or before the 15th day of the third (3rd) month after the end of SBX's tax year (following the year in which the termination occurs), whichever is later.

   **B.** <u>Retention Incentive Payment</u>.  As an incentive for you to continue your work with SBX until December 31, 2012, if you are employed on that date you will be entitled to, and will be paid, a retention incentive payment equal to sixty percent (60%) of your then current Base Salary.  Even if you are not employed by SBX on December 31, 2012, you will still be entitled to receive the full retention incentive payment upon your termination, if (i) SBX terminated your employment without Good Cause; (ii) you resigned your employment for Good Reason by giving written notice to the Chief Executive Officer of SBX specifying in reasonable detail the particular factors forming the basis for such Good Reason; or (iii) SBX undergoes a Change of Control.  If you decide to terminate your employment for any reason other than Good Reason you will not be entitled to, and will not receive, any portion of the retention incentive payment.  However, termination of your employment on account of your death or disability (whether or not work-related) will not cause you to forfeit the retention incentive payment if you are otherwise eligible for it, except that the retention incentive payment will be prorated based on the number of full months you worked from January 1, 2010 to the date of termination of your employment on account of your death or disability.  In that case, payment will be made to your estate, or legal representative entitled to such payment.

If payable, the retention incentive payment will be paid to you, less all applicable state and federal tax withholding and other lawful deductions, in one lump sum on the next payday following December 31, 2012, or the date of termination of your employment, whichever applies.  For the retention benefit payment to qualify under the short-deferral exemption under Internal Revenue Code Section 409A ("Section 409 A") and Treasury Regulation Section 1.409A-1(b)(4), all retention incentive payments payable to you will be paid on or before March 15, 2013, or on or before the 15th day of the third (3rd) month after the end of SBX's tax year (following the year in which entitlement to the payment accrues), whichever is later.

With respect to the severance benefit and the retention incentive payment, the "termination date" shall be the date your employment with SBX terminates for any reason.  Any notice of termination given pursuant to the provisions of this letter shall specify the termination date.

It is intended that the terms and conditions of the severance benefit and the retention incentive payment be construed to comply with the provisions of Section 409A and the applicable Treasury Regulations and other guidance issued thereunder in a manner that such payments shall not be treated as deferred compensation under Section 409A, and shall not be subject to the tax on nonqualified deferred compensation which does not

Theresa Weekes, CPA
February 22, 2010
Page 6

meet the requirements of Section 409A. Notwithstanding any provision in this letter to the contrary, the terms and conditions of these payments shall be interpreted, construed and conformed in accordance with Section 409A and the applicable Treasury Regulations and other guidance issued thereunder. Nothing with respect to the severance benefit or retention incentive offered above, or any other terms or conditions stated herein, will alter the at will-will nature of the employment relationship.

Your receipt of the severance benefit and/or the retention incentive (in the case of an involuntary termination prior to December 31, 2012) shall be your sole and exclusive remedy in the event of an involuntary termination. By signing below, you acknowledge and agree that such remedy bears a reasonable relationship to the damages you may suffer by reason of the termination of employment, and the remedies set forth herein are not unreasonable under the circumstances existing as of the date of your signature. In the event SBX terminates you for Good Cause, and it is later determined by SBX, or later adjudicated by a court or arbitrator, that there was not Good Cause for the termination, the termination of your employment shall be deemed without Good Cause, in which case the termination will be governed solely and exclusively by the terms and conditions set forth above for a termination without Good Cause.

Like every employee of SBX, you will still be required to comply with all of SBX's policies and procedures as may be communicated to you from time to time, including those in SBX's employee handbook, including its policies prohibiting unlawful harassment and discrimination.

This letter contains the entire agreement for your employment by SBX and shall be in addition to any policies and procedures of SBX, except those policies and procedures which may be inconsistent with the terms hereof. To the extent any of SBX's policies or procedures are in conflict with the terms and conditions of this letter, this letter shall control. Except as herein provided, this letter supersedes any and all other agreements, either oral or in writing, between you and SBX with respect to your employment and contains all of the covenants and agreements between your and SBX with respect to matters set forth herein. You acknowledge that no representation, inducements, promises, or agreements, oral or otherwise, have been made to you which are not embodied herein, and that no other agreement, statement, or promise not contained herein shall be valid or binding on SBX.

Notwithstanding the foregoing, this letter does not operate to supersede, alter or revoke any other agreements or acknowledgments of receipt of any documents that you have executed in favor of SBX, including, but not limited to, agreements concerning the confidentiality and nondisclosure of SBX's proprietary information, employee handbooks, employment polices and the like, all of which shall remain in full force and effect to the extent the same are not in conflict with the terms set forth in this letter.

Theresa Weekes, CPA
February 22, 2010
Page 7

The obligations of SBX as set forth in this letter shall be deemed to be the joint and several obligations of SBX and CTV.

Please sign the duplicate of this letter to indicate your acceptance and return it to me.  In the meantime, please feel free to call me if you have any questions.

Sincerely,

Greg Hulsizer
Chief Executive Officer
California Transportation Ventures, Inc.
General Partner of South Bay Expressway, L.P.

I hereby acknowledge and accept the terms and conditions of employment as set forth above, to be effective January 1, 2010.

Theresa Weekes

**EXHIBIT G**



Put the fun back in driving!

1129 La Media Road, San Diego, CA 92154
p. 619.710.4000 • f. 619.710.4097

southbayexpressway.com

February 22, 2010

Srinivas Savgur
1304 Weaverville St,
Chula Vista, CA 91913

Re:  Amendment of Employment Terms

Dear  Shane:

This letter is to meant to fully amend and replace, in its entirety, the letter agreement dated July 14, 2004 under which you were offered, and signed to accept, your initial employment with South Bay Expressway, L.P. ("SBX").  The terms and conditions for your employment, as set forth in this letter will be effective January 1, 2010.

The confidentiality and nondisclosure agreement, the agreement limiting the statute of limitations for employment related claims and requiring arbitration for all such claims as mentioned in the July 14, 2004 letter, and any other agreements or acknowledgements you have signed in favor of SBX will still remain in full force and effect (except to the extent they may be inconsistent with the terms and conditions stated in this letter, which case this letter will control).

As the Chief Technology Officer, you will continue to report to me as the Chief Executive Officer, and your general responsibilities will include:

- Managing SBX IT activities associated with the FOE tolling system and Administrative systems
- Ensuring 24/7 availability of FOE and Administrative systems, including interoperability with other California toll facilities and SBX interactive website
- Ensuring revenue collection and other critical processes run according to schedule
- Managing development and roll-out of new software and other functionality
- All other duties and responsibilities associated with the position and as may be assigned to you from time to time, either verbally or in writing

As a member of the SBX management team, you will be expected to effectively coordinate with the other members of the management team, our third party systems integrator, other service providers such as Caltrans and the California Highway Patrol, and our public partners.  From time to time, you may be called upon to represent SBX on various regional projects and issues.  You may also be called on to represent California Transportation Ventures, Inc. (CTV), the managing partner of SBX, and/or our affiliated companies regarding other business activities.  From time to time, your assignment may require travel out of the area.  Your duties will require you to carry a company-provided cellular phone/blackberry and to be available to respond to emergencies on a twenty-four (24) hour, seven (7) day per week basis.  In order for you to fulfill your responsibilities as

Srinivas Savgur
February 22, 2010
Page 2

Chief Technology Officer, it is expected that your residence (or alternate living arrangements) will continue to be located so as to allow timely response to the SBX office, should your presence be required during non-business hours for emergencies or other matters.

As before, your employment with SBX will be at-will and not for any specific term and may be terminated by you or SBX at any time, with or without cause and with or without notice. The at-will nature of your employment will be the only and entire agreement between you and SBX concerning the duration of your employment and the circumstances under which either you or SBX may terminate the employment relationship. No person affiliated with SBX or CTV has the authority to enter into any oral agreement that changes the at-will status of employment with SBX. The at-will term of your employment can only be changed in a writing signed by you and the Chief Executive Officer of CTV on behalf of SBX, which writing expressly states the intention to modify the at-will term of your employment. By signing below and accepting this offer, you acknowledge and agree that your employment with SBX will be strictly at-will, and nothing, unless expressly stated herein, will create any implied or express contract requiring cause for termination of employment.

Your annual salary, as it is currently, will be $139,000 ("Base Salary"), paid according to SBX's regular paydays, directly deposited, if you choose, to your specified bank account. The Chief Technology Officer position is an "exempt" position. You will not be entitled to compensation for any overtime hours worked, and are expected to work whatever hours are necessary to effectively fulfill your responsibilities.

As in the past, your performance will be formally reviewed in December of each year, with salary adjustment, if any, effective January 1 of the following year. Your next opportunity to be considered for a Base Salary adjustment will be in December 2010. You can also expect periodic, less formal performance reviews that we find quite valuable to keep our team running smoothly.

By no later than March 31, 2010, SBX will conduct a market analysis for your position to establish where your current compensation stands relative to similar positions in the San Diego area. After the analysis is completed, we have agreed to review your Base Salary and to consider an adjustment in advance of December 2010. Should the market analysis indicate that your Base Salary is below the 50th percentile for similar positions in the San Diego area, effective July 1, 2010, SBX will increase your Base Salary to the 50th percentile, or to an annual Base Salary of $150,000, whichever is less.

You will continue to receive SBX's standard employee benefits package, including sick leave, life and disability insurance coverage and participation in the 401k plan, subject to

Srinivas Savgur
February 22, 2010
Page 3

the requirements for participation, waiting periods, vesting and otherwise as provided by the benefit plans.  Effective January 1, 2010, you will be entitled to 20 days paid vacation per year until you reach the maximum accrual provided under SBX's vacation policy, at which time vacation accrual will cease and begin again once you are below the maximum allowed accrual.

Starting in December 2010, you will be considered for annual discretionary bonus compensation of up to a maximum of twenty percent (20%) of your annual Base Salary.  These bonuses are based on SBX achieving its financial goals and your accomplishment of specific work program goals and are paid, if at all, in January.  To the extent that you meet all of your KPI and Work Program goals (unless affected by circumstances outside of your control), you will be entitled to a minimum performance bonus equal to 10% of your annual Base Salary.

Additionally, SBX offers the following financial benefits to you:

      A.    *Severance Benefit*.    Although your employment continues to be at-will, allowing either you or SBX to terminate the employment relationship at anytime, with or without notice and with or without cause, SBX will pay you a special, one time only severance benefit equal to six (6) months of your current Base Salary only if (i) SBX terminates your employment without Good Cause;[1] or (ii) you resign your employment for Good Reason[2] by giving written notice to the Chief Executive Officer of SBX

---

[1] "Good Cause" means and shall exist if, and only if:
      (i) you willfully breach or habitually neglect and/or demonstrate a continued incapacity to perform your duties;
      (ii) you commit acts of dishonesty, fraud, misrepresentation, or other acts that, as determined by SBX in its reasonable discretion, prevent or could prevent the effective performance of your duties
      (iii) you are convicted of a crime which constitutes a felony under applicable law or enter a plea of guilty or nolo contendere with respect thereto;
      (iv) you engage in any fraudulent or willful misconduct that is materially detrimental to the interests, reputation, character or standing of SBX; or
      (v) you engage in acts or omissions that give rise to termination of your employment under SBX's employment policies.
      In the case of Good Cause SBX must give written notice to you specifying in reasonable detail the particular factors forming the basis for such Good Cause.

[2] "Good Reason" as used herein involves circumstances that generally support a determination that your resignation is the functional equivalent of an involuntary termination, and shall exist upon the occurrence of any of the following:
      (i)  a material diminution in your compensation and/or benefits described herein (including the severance benefit and retention incentive);

Srinivas Savgur
February 22, 2010
Page 4

specifying in reasonable detail the particular factors forming the basis for such Good Reason.  If you decide to terminate your employment for any reason other than Good Reason, or your employment terminates on account of your death or you become disabled,[3] and the disability is not directly related to your work, you will not be entitled, and will not receive, any portion of this severance benefit.

---

(ii)  an assignment to you or change of any duties inconsistent in any material respect with your position (including status, title and reporting relationships), authority, duties or responsibilities, or any other action or actions by SBX which when taken as a whole results in a material diminution in your position, authority, duties or responsibilities.  Excluded for this purpose shall be any isolated, immaterial and inadvertent action not taken in bad faith and which is remedied by SBX immediately after receipt of your written notice describing such action;

(iii)  a material diminution in the budget over which you retain authority, if any;

(iv)  a relocation of the Company's business office where you perform a substantial part of your duties to a location more than fifty (50) miles from its present location (unless such relocation is consented to by you or closer to your residence), or the Company requires you to be based at any location other than within fifty (50) miles of the Company's present office location (except for requirements of temporary travel on the Company's business to an extent substantially consistent with your business travel obligations existing immediately prior to the date of this letter);

(vi)  SBX undergoes a Change of Control; or

(vii)  any other action or inaction by the SBX that constitutes a material breach of one or more of the terms set forth in this letter.

SBX shall undergo a Change in Control if: (i) any person or entity other than CTV or any affiliate of CTV becomes the beneficial owner of SBX or a substantial part of SBX's assets; (ii) approval has been given for a consolidation, recombination or merger of SBX in which SBX is not the continuing or surviving entity or; (iii) there is a sale, lease, exchange, foreclosure, repossession or other transfer of all or substantially all of the assets of SBX in one related transaction. In all cases, a Change in Control shall not occur if you have been offered and accepted or rejected employment by any entity that substantially succeeds to SBX's interests that is substantially the same as your employment with SBX in terms of compensation, title, duties and responsibilities.

In all cases, Good Reason for you to resign your employment shall not exist unless: (i) you first provide the Chief Executive Officer of SBX with written notice specifying in reasonable detail the particular factors forming the basis for such Good Reason.  Such notice must be given by you within ninety (90) days of the initial existence of a condition of Good Reason and SBX shall have a period of thirty (30) days from receipt of such notice to cure such condition; and (ii) you actually resign and terminate your employment within a period of time not exceeding six (6) months following the initial existence of a condition of Good Reason for your resignation.  Your failure to resign within such period will be deemed your acceptance of the circumstances that may have given rise to the existence of Good Reason.

[3] "Disabled" means the same as in any applicable SBX disability insurance policy covering you, or in the absence thereof, that you cannot perform your essential job functions for a continuous period of sixty (60) days, even with reasonable accommodations, due to a physical or mental incapacity.  If your employment is terminated due to disability, the termination shall be effective on such sixtieth (60th) day.

Srinivas Savgur
February 22, 2010
Page 5

As a condition to the receipt of any severance benefit, you will be required to sign SBX's form of severance agreement and general release ("Release") within thirty (30) days after termination of your employment. If payable, at SBX's option, the severance benefit will be paid to you, less all applicable state and federal tax withholding and other lawful deductions, in one lump sum on the next payday following SBX's receipt of the Release, or in installments on SBX's normal paydays over a six (6) month period. However, for the severance benefit to qualify under the short-deferral exemption under Internal Revenue Code Section 409A ("Section 409 A") and Treasury Regulation Section 1.409A-1(b)(4), all severance benefit payments payable to you will be paid on or before March 15th of the year following the year in which the termination occurs, or on or before the 15th day of the third (3rd) month after the end of SBX's tax year (following the year in which the termination occurs), whichever is later.

        B.      Retention Incentive Payment. As an incentive for you to continue your work with SBX until December 31, 2012, if you are employed on that date you will be entitled to, and will be paid, a retention incentive payment equal to sixty percent (60%) of your then  current Base Salary. Even if you are not employed by SBX on December 31, 2012, you will still be entitled to receive the retention incentive payment upon your termination, if (i) SBX terminated your employment without Good Cause; (ii) you resigned your employment for Good Reason by giving written notice to the Chief Executive Officer of SBX specifying in reasonable detail the particular factors forming the basis for such Good Reason; or (iii) SBX undergoes a Change of Control. If you decide to terminate your employment for any reason other than Good Reason you will not be entitled to, and will not receive, any portion of the retention incentive payment. However, termination of your employment on account of your death or disability (whether or not work-related) will not cause you to forfeit the retention incentive payment if you are otherwise eligible for it, except that the retention incentive payment will be prorated based on the number of full months you worked from January 1, 2010 to the date of termination of your employment on account of your death or disability. In that case, payment will be made to your estate, or legal representative entitled to such payment.

If payable, the retention incentive payment will be paid to you, less all applicable state and federal tax withholding and other lawful deductions, in one lump sum on the next payday following December 31, 2012, or the date of termination of your employment, whichever applies, or at SBX's option, in installments on SBX's normal paydays over a six (6) month period. For the retention benefit payment to qualify under the short-deferral exemption under Internal Revenue Code Section 409A ("Section 409 A") and Treasury Regulation Section 1.409A-1(b)(4), all retention incentive payments payable to you will be paid on or before March 15, 2013, or on or before the 15th day of the third

Srinivas Savgur
February 22, 2010
Page 6

(3rd) month after the end of SBX's tax year (following the year in which entitlement to the payment accrues), whichever is later.

With respect to the severance benefit and the retention incentive payment, the "termination date" shall be the date your employment with SBX terminates for any reason.  Any notice of termination given pursuant to the provisions of this letter shall specify the termination date.

It is intended that the terms and conditions of the severance benefit and the retention incentive payment be construed to comply with the provisions of Section 409A and the applicable Treasury Regulations and other guidance issued thereunder in a manner that such payments shall not be treated as deferred compensation under Section 409A, and shall not be subject to the tax on nonqualified deferred compensation which does not meet the requirements of Section 409A.  Notwithstanding any provision in this letter to the contrary, the terms and conditions of these payments shall be interpreted, construed and conformed in accordance with Section 409A and the applicable Treasury Regulations and other guidance issued thereunder. Nothing with respect to the severance benefit or retention incentive offered above, or any other terms or conditions stated herein, will alter the at-will nature of the employment relationship.

Your receipt of the severance benefit and/or the retention incentive (in the case of an involuntary termination prior to December 31, 2012) shall be your sole and exclusive remedy in the event of an involuntary termination.   By signing below, you acknowledge and agree that such remedy bears a reasonable relationship to the damages you may suffer by reason of the termination of employment, and the remedies set forth herein are not unreasonable under the circumstances existing as of the date of your signature.  In the event SBX terminates you for Good Cause, and it is later determined by SBX, or later adjudicated by a court or arbitrator, that there was not Good Cause for the termination, the termination of your employment shall be deemed without Good Cause, in which case the termination will be governed solely and exclusively by the terms and conditions set forth above for a termination without Good Cause.

Like every employee of SBX, you will still be required to comply with all of SBX's policies and procedures as may be communicated to you from time to time, including those in SBX's employee handbook, including its policies prohibiting unlawful harassment and discrimination.

This letter contains the entire agreement for your employment by SBX and shall be in addition to any policies and procedures of SBX, except those policies and procedures which may be inconsistent with the terms hereof.  To the extent any of SBX's policies or procedures are in conflict with the terms and conditions of this letter, this letter shall

Srinivas Savgur
February 22, 2010
Page 7

control. Except as herein provided, this letter supersedes any and all other agreements, either oral or in writing, between you and SBX with respect to your employment and contains all of the covenants and agreements between your and SBX with respect to matters set forth herein. You acknowledge that no representation, inducements, promises, or agreements, oral or otherwise, have been made to you which are not embodied herein, and that no other agreement, statement, or promise not contained herein shall be valid or binding on SBX.

Notwithstanding the foregoing, this letter does not operate to supersede, alter or revoke any other agreements or acknowledgments of receipt of any documents that you have executed in favor of SBX, including, but not limited to, agreements concerning the confidentiality and nondisclosure of SBX's proprietary information, employee handbooks, employment polices and the like, all of which shall remain in full force and effect to the extent the same are not in conflict with the terms set forth in this letter.

The obligations of SBX as set forth in this letter shall be deemed to be the joint and several obligations of SBX and CTV.

Please sign the duplicate of this letter to indicate your acceptance and return it to me. In the meantime, please feel free to call me if you have any questions.

Sincerely,

Greg Hulsizer
Chief Executive Officer
California Transportation Ventures, Inc.
General Partner of South Bay Expressway, L.P.

I hereby acknowledge and accept the terms and conditions of employment as set forth above, to be effective January 1, 2010.

_____
Srinivas Savgur

Savgur Employment Letter Agreement - Final 100222 (2)